*In re* MARRIAGE OF JOAN L. JARVIS, f/k/a Joan L. Dempsey, Petitioner-Appellant, and CHARLES W. DEMPSEY, Respondent-Appellee.

Fourth District   No. 4—92—0713

Argued April 14, 1993.—Opinion filed June 3, 1993.

Lawrence E. Johnson and Reid J. Rozen (argued), both of Lawrence E. Johnson & Associates, P.C., of Champaign, for appellant.

M. Eugene Wright (argued), of Danville, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Joan Jarvis, formerly known as Joan Dempsey, appeals from the judgment of the circuit court of Vermilion County, ordering the distribution of marital assets. (Ill. Rev. Stat. 1991, ch. 40, par. 503(d).) Jarvis alleges the trial court erred in (1) awarding the family business to respondent, Charles Dempsey, without ordering offsetting payments to her; (2) awarding her assets and maintenance, rather than a greater share of the assets; and (3) apportioning assets although not provided with sufficient evidence to value the business. We disagree and affirm.

## I. FACTS

Jarvis and Dempsey were married in 1972. Jarvis filed a petition for dissolution of marriage on May 8, 1991. The marriage was dissolved on June 16, 1992. Hearings on the issue of distribution of assets and maintenance were held between October 1991 and April

1992. At hearing in October 1991, Dempsey testified he was 54 years old. At hearing in November 1991, Jarvis testified she was 56 years old. No children were born to or adopted by the parties; however, Jarvis had three children from a prior marriage.

Dempsey was employed by General Motors (GM), during most of the 20-year marriage and for about the 10 years preceding it. Jarvis had been employed as a bookkeeper at various companies during the marriage. Jarvis testified she was employed at Case Power and Equipment as a bookkeeper when the parties married. She worked at Case for three years, and could not recall her salary. She then worked in the payroll department at Peterson's for three years, earning about $150 per week. She next worked for Galaxy Homes, doing bookkeeping and showing rental apartments for two years, earning $150 to $200 per week. She thereafter worked for 6½ years as a bookkeeper for Interstate Lumber, earning more than $200 per week. More recently she tended bar for three years, earning $250 per week. In 1986, Jarvis was hospitalized for six to eight days for a chronic lung disease. After she was released from the hospital she worked as a bookkeeper at Klayer Ag Service, earning $7.50 an hour and working 20 to 60 hours per week. In 1988, Jarvis earned $13,755 working at Klayer.

In 1989, Jarvis and Dempsey purchased a tavern from the estate of Jarvis' father. The purchase price was $55,000, which included the tavern, everything in the tavern, and the realty on which the tavern was located. Jarvis and Dempsey obtained a bank loan to finance the purchase of the tavern. The parties opened the tavern in April 1989. Dempsey was involved in the day-to-day operations of the tavern, and Jarvis took care of the books. Between April 1989 and September 1991, Jarvis kept the books for the business and assisted in cleaning and closing the tavern at night. In September 1990, Dempsey retired from his job at General Motors. Dempsey testified he retired pursuant to an agreement with Jarvis that he would do so in order to run the tavern. Dempsey took a real estate course and obtained his realtor's license in December 1990 or January 1991. In May 1991, Jarvis filed a petition for dissolution.

Beginning in September 1991, Jarvis worked in the tavern on Wednesday and Thursday nights and took care of the ordering. When asked if, after the opening of the tavern, she had been offered a bookkeeping job by Clint Hawkins and Ron Osterbur at WACO, Jarvis initially responded in the negative, but then admitted she had been offered such a position, but stated the offer was made in a kidding

manner because Hawkins and Osterbur knew she could not go back to work.

At the time of the dissolution proceedings, the parties still owed over $45,000 on the tavern loan. Dempsey had sold only one home, earning $1,152. The testimony was unclear regarding the gross income received by the parties from the tavern, partially due to their practice of paying personal expenses out of the tavern account and "holding out." The parties "held out" money by placing a portion of the cash received in the operation of the tavern in a box, and did not report the cash in the box as income. In rendering its decision, the trial court noted Jarvis' "bookkeeping practices appear suspect at best, and her memory, as well as her production of documents in support of her claims were selective from the beginning of the case to the end."

The parties had elected for the tavern to be treated as a subchapter S corporation, with each party being a 50% shareholder. Thus, each party reports half the tavern's net income as income, and each party is responsible for the taxes on his or her own share of the income received from the tavern. In 1989 the parties reported a $13,477 net loss from the tavern. In 1990 the parties initially reported a $3,720 net loss from the tavern; however, during the pendency of the dissolution proceedings Jarvis arranged for an amended return to be filed reflecting gross income of $18,740 from the tavern. In 1991, the parties reported receipt of gross income of $38,650 from the tavern.

Jarvis submitted a financial affidavit setting forth her monthly expenses as $1,856.55, including $196.20 for the mortgage payment on the marital residence, and $510.03 for her car payment.

On June 16, 1992, the court filed its supplemental order of dissolution, resolving the issues of distribution of assets and maintenance. In the judgment order, as modified by the court's ruling on Jarvis' post-trial motion, the court awarded Jarvis the marital residence ($53,500); the furniture, furnishings and appliances in her possession; a 1987 Cadillac (worth $8,400), six cemetery graves ($905 value), and her individual retirement account (IRA) ($9,578); and half of the pretax and penalty value of Dempsey's 401(K) plan ($12,101.81). The court further (1) ordered Dempsey to pay Jarvis $12,101.81—half the pretax and penalty value of his 401(K) plan—within 41 days of the ruling on the post-trial motion (Jarvis was not required to pay the 10% penalty or income taxes which will be due if Dempsey withdraws money from the 401(K) to pay Jarvis $12,101.81); and (2) awarded her one-third of Dempsey's GM pension, subject to proportionate change

when Dempsey's pension is redetermined at age 62 and subject to proportionate increase for any increase in benefit under the plan. (In reaching the one-third amount, the trial court determined the pension had been earned over 30 years, 20 of which the parties were married. The court found two-thirds of the pension was the marital portion of the pension. The court awarded Jarvis 50% of the marital portion (two-thirds) of the pension, which amounts to one-third of the total pension benefits.) The court also (3) ordered Dempsey to execute a qualified domestic relations order providing for payment of a portion of his GM pension to Jarvis and execute documents providing Jarvis would retain her right of survivorship under the plan; (4) awarded Jarvis permanent maintenance of $500 per month; and (5) ordered Dempsey to pay Jarvis additional maintenance in the form of her insurance premiums and health coverage. Jarvis was ordered to pay the balance of the loan for her Cadillac ($4,590.31).

The court awarded Dempsey the tavern, fixtures and real estate (worth $55,000), and ordered him to pay the mortgage on that real estate ($45,895) and all business debts. The court awarded Dempsey his 1989 Chevrolet pickup (worth $9,650) and ordered him to pay the debt on his pickup ($779.45). The court awarded Dempsey half of his 401(K) plan (worth $12,101.82); two-thirds of his GM pension (one-third of the pension as his nonmarital property, and one-third as his share of the marital portion of the pension); any furniture, furnishings and other property in his possession; his IRA ($9,578); and 14 shares of GM stock ($516.32 value). Dempsey was also ordered to pay the mortgage on the marital home awarded to Jarvis ($1,967.54). Each party was ordered to pay the debts he or she incurred after they separated.

## II. ANALYSIS

### A. *Distribution of Income-Producing Property*

Jarvis alleges the trial court erred in awarding the income-producing property to Dempsey, as part of his share of the marital assets, without ordering him to make offsetting payments to her. The trial court set forth its reasons for awarding the tavern to Dempsey as follows:

> "The Court has considered all of the factors set forth in Section 503. It is clear that both parties made substantial contributions to the acquisition of the tavern, both in terms of money spent and in terms of personal efforts expended in the day[-]to[-]day operation of the business. On the one hand, Mrs.

Dempsey invested a large portion of her inheritance in order to obtain the tavern, which had been owned and operated by her family for many years. On the other hand, the Court is convinced that Mr. Dempsey did in fact retire from his position at General Motors so he could concentrate on running the business. The main concern of the Court, quite frankly, is to preserve the tavern as a reliable source of income in order to arrive at a realistic plan for both parties in the future, while providing a sensible and equitable division of the marital estate. The Court is persuaded that Mr. Dempsey is more likely to be able to run the business successfully than Mrs. Dempsey. The Corner Lounge is accordingly awarded to Mr. Dempsey; he is ordered to pay all outstanding debts associated with the business, and to indemnify Mrs. Dempsey and hold her harmless thereon."

When it is necessary to award income-producing assets to one spouse, the trial court may effect an equitable distribution of property by authorizing offsetting payments to the other spouse. (*In re Marriage of Schroeder* (1991), 215 Ill. App. 3d 156, 163, 574 N.E.2d 834, 838.) This is not to say that ordering offsetting payments is the *only* method of effecting an equitable distribution. Rather, as in the present case, an equitable distribution may be attained by awarding the spouse who does not receive the income-producing assets a greater share of the total net marital assets.

In the present case, each party was awarded half of the marital portion of the pension and the household goods in his or her possession. Each party was ordered to pay his or her own debts incurred after the dissolution. Of the remaining marital assets Jarvis was awarded the house ($53,500), Cadillac ($8,400), cemetery plots ($905), her IRA ($9,578), and half of the pretax and penalty balance of the 401(K) plan ($12,101.81). The only marital debt Jarvis was ordered to assume was the loan on the Cadillac ($4,590.31). Thus, Jarvis received net marital assets in the amount of $79,894.50

In contrast, Dempsey received the business ($55,000), pickup ($9,650), stock ($516.32), his IRA ($9,578), and half of the pre-tax and penalty portion of the 401(K) plan ($12,101.82). Dempsey was ordered to pay marital liabilities in the amount of $48,641.96, which includes the tavern loan ($45,895), residence mortgage ($1,967.54), and pickup loan ($779.45). Thus, Dempsey received net marital assets of $38,204.15. Additionally, Dempsey is responsible for any business debts. Moreover, if Dempsey withdraws money from the 401(K) plan

to give Jarvis her $12,101.82 share, he will be responsible for the 10% penalty and income tax.

■ Jarvis' $79,894.50 portion of the net marital assets is significantly larger than Dempsey's $38,204.15 portion. This award adequately compensated Jarvis for the award of the income-producing assets to Dempsey, and offsetting payments were not required in order to obtain an equitable distribution of the property.

Moreover, apparently recognizing Jarvis' property award would not provide for all of her needs, the trial court ordered Dempsey to pay maintenance of $500 per month, and "additional maintenance" in the amount of Jarvis' insurance premiums, which are currently $379 per month. Thus, out of Dempsey's $1,492.92 net monthly pension benefits, $497.64 is paid to Jarvis as her share of the marital portion of the pension, and $879 is paid to or on behalf of Jarvis for maintenance and additional maintenance. This leaves a balance of $116.28 retained by Dempsey. As a result of the distribution of assets, Jarvis has a home in which to live, without paying rent or mortgage payments, while Dempsey must pay for alternate living arrangements. Clearly, the court intended for Dempsey to use the income generated by his efforts at the tavern to cover the difference between his reasonable needs and the $116.28 per month in pension benefits he retains.

### B. *More Property Instead of Maintenance*

Jarvis alleges the trial court erred in its allocation of marital assets and maintenance to her, rather than simply awarding her a larger portion of the net marital assets—presumably including the tavern—and less or no maintenance. In support of her position, Jarvis sets forth the proposition that when one spouse has a disproportionately larger earning potential, there is a preference for providing the other party with a larger share of the marital assets, rather than an award of maintenance. This is an accurate statement of the law; however, we do not believe its application to this case requires an allocation of *more* marital assets to Jarvis. Moreover, the evidence at trial did not establish Dempsey had an earning potential which was disproportionately greater than that of Jarvis.

Although Jarvis alleges Dempsey has a greater earning potential than she, and she is prevented from working due to her health, this allegation is not supported by the evidence. Jarvis testified she suffered from emphysema. According to Jarvis, her physician told her in 1989 that she could not work, and she should therefore apply for social security disability. Jarvis applied for and was denied disability. She had not

since asked her physician whether she is able to work. Jarvis presented no medical testimony in support of her position that her emphysema prevents her from being employed. Nor did she, during the course of her own testimony, explain why her emphysema would impede her ability to work as a bookkeeper. In fact, Jarvis testified she had been doing the bookkeeping and ordering for the tavern, assisting in cleaning the tavern, and working at the tavern two nights a week.

■ Neither did the evidence establish Dempsey had a disproportionately larger earning potential than Jarvis. The evidence established Dempsey became licensed to sell real estate in January 1991, and earned a total of $1,152 through selling real estate on a part-time basis. Jarvis had worked as a bookkeeper for a number of years, earning $13,755 in her final year of employment. In light of Jarvis' employment experience, we do not believe her earning power is disproportionally lower than that of Dempsey. Thus, as the evidence did not establish disproportionate earning power or an inability of Jarvis to maintain employment due to her emphysema, Jarvis' argument that the trial court should have awarded her more of the net marital assets necessarily fails. The cases relied upon by Jarvis do not convince us otherwise.

Jarvis cites *Hollensbe v. Hollensbe* (1988), 165 Ill. App. 3d 522, 519 N.E.2d 40, in support of her argument. *Hollensbe* is distinguishable. In *Hollensbe*, the trial court determined it would make an award of maintenance in lieu of an equitable distribution of property. The appellate court reversed, noting maintenance may be awarded where the equitable distribution of property is inadequate to provide for the spouse's needs; however, maintenance may not be awarded *instead* of an equitable distribution of property. (*Hollensbe*, 165 Ill. App. 3d at 527, 519 N.E.2d at 43.) In the present case, maintenance was not awarded in lieu of an equitable distribution of property. Rather, Jarvis was awarded maintenance *in addition* to receiving the larger share of the net marital assets.

Jarvis also cites *In re Marriage of Emery* (1989), 179 Ill. App. 3d 744, 534 N.E.2d 1014, in support of her position. Earl and Louise Emery were aged 59 and 55, respectively, at the time their 16½-year marriage was dissolved. (*Emery*, 179 Ill. App. 3d at 745, 534 N.E.2d at 1015.) At the time of dissolution, Earl was employed earning $480 per week. Louise was awarded custody of the Emerys' minor child. Louise presented medical testimony that she could not have a job which would require her to sit or stand for eight hours per day, or to lift heavy objects. Louise was awarded 47% of the total marital assets. A portion of the marital assets awarded to Louise included one

third of Earl's pension. The trial court found Louise was entitled to maintenance, but instead awarded her one-third of Earl's pension as property in lieu of maintenance; in doing so, the court essentially considered the pension twice in dividing the marital property and again in considering it an award of maintenance. This essentially reduced her proportionate share of the marital assets to 21.3%. This court noted Louise, due to her medical condition, lack of vocational skills, and child care responsibilities, was unable to match Earl's earning potential. (*Emery*, 179 Ill. App. 3d at 749, 534 N.E.2d at 1017.) Accordingly, we reversed and remanded for a redistribution of property, and an award of maintenance if appropriate. *Emery*, 179 Ill. App. 3d at 752, 534 N.E.2d at 1019.

The present case is distinguishable from *Emery*. Unlike the trial court in *Emery*, the trial court in this case did not consider marital assets twice—both in making the distribution of marital property, and awarding them as property in lieu of maintenance. Rather, Jarvis received both marital assets and maintenance. Moreover, the trial court awarded Jarvis significantly more assets and maintenance than were awarded by the trial court to Louise. *Emery* does not support Jarvis' contention she should have been awarded more of the net marital assets.

Nor does *In re Marriage of Campise* (1983), 115 Ill. App. 3d 610, 450 N.E.2d 1333, cited by Jarvis, support her argument. Jasper and Theresa Campise were married for 27 years. At the time of dissolution Jasper worked full-time as a police officer, and part-time for National Broadcasting Company, earning net income of $2,094 per month. Theresa had been unemployed for 14 years, due to a back problem which prevented her from sitting in one position for any extended period of time. (*Campise*, 115 Ill. App. 3d at 612-13, 450 N.E.2d at 1335.) Theresa had no education beyond high school. The court awarded $5,924.50 in marital assets, plus half of the profits from the sale of an Arizona home to Jasper, and between $6,074.50 and $7,074.50 in marital assets, plus half of the profits from the sale of the Arizona home to Theresa. (*Campise*, 115 Ill. App. 3d at 613, 450 N.E.2d at 1335-36.) Thus, Theresa either received slightly more, or slightly less, than 50% of the marital assets. The court additionally awarded Theresa 40% of Jasper's pension benefits, which he had not yet begun to draw, but which would provide Theresa with an income of $534 per month once Jasper retired. The court also awarded Theresa temporary maintenance. The appellate court reversed, finding in light of Theresa's age, length of marriage, poor health, educational background, and lack of vocational skills, and Jasper's full- and

part-time employment, the trial court erred in the distribution of property and award of maintenance limited to five years. The appellate court remanded, instructing the trial court to retain jurisdiction and review the need for maintenance after five years. (*Campise*, 115 Ill. App. 3d at 615, 450 N.E.2d at 1337.) The appellate court also urged the trial court to consider awarding Theresa the Arizona home instead of an interest in Jasper's pension benefits. *Campise*, 115 Ill. App. 3d at 617, 450 N.E.2d at 1337-38.

The present case is distinguishable from *Campise*. Dempsey, unlike Jasper, does not have either full- or part-time steady employment. While he currently earns income through his work at and ownership of the tavern, if this asset were awarded to Jarvis, he would no longer receive this income. Moreover, Jarvis, unlike Theresa, has not been absent from the workforce for 14 years. Additionally, the testimony did not establish Jarvis could not work due to her emphysema.

Finally, Jarvis cites *In re Marriage of Aschwanden* (1980), 82 Ill. 2d 31, 411 N.E.2d 238, in support of her position. Albert and Edith Aschwanden were married for 25 years and were 51 and 46, respectively, at the time of dissolution. (*Aschwanden*, 82 Ill. 2d at 32-34, 411 N.E.2d at 239-40.) In the three years prior to dissolution Albert earned between $81,300 and $116,024 per year. At the time of the dissolution Edith earned $6,000 per year, working 22 hours per week as a dental assistant. Edith testified she could not work more hours per week due to a back ailment, for which she had received three operations. The trial court awarded Edith 22% of the marital assets and temporary maintenance of $15,000 per year. (*Aschwanden*, 82 Ill. 2d at 33-37, 411 N.E.2d at 239-41.) The supreme court affirmed this court's reversal of the distribution of property and maintenance. The court noted Edith's station and health left her with little opportunity to maintain the standard of living to which the Aschwandens had become accustomed or to acquire significant amounts of assets or income in the future. (*Aschwanden*, 82 Ill. 2d at 37, 411 N.E.2d at 241.) Thus, the matter was remanded to the trial court for a redistribution of marital assets. The court stated "if sufficient marital property is found, an award of maintenance may be unnecessary. If there is not sufficient marital property, however, maintenance should be considered." *Aschwanden*, 82 Ill. 2d at 38, 411 N.E.2d at 242.

The present case is distinguishable from *Aschwanden*. Jarvis was awarded more than half the net marital assets, as opposed to the 22% of marital assets awarded to Edith. Moreover, in *Aschwanden*, the evidence established Albert had an earning power 13.6 to 19.3 times greater than Edith. That is not the case here. The testimony in *Asch-*

*wanden* additionally established Edith was earning the most she could, whereas here, Jarvis has not sought, and may have actually refused, employment.

## C. *Valuation of the Business*

■ Jarvis alleges the trial court erred in making an award of the tavern because it lacked proper evidence upon which to value the business. Specifically, Jarvis alleges the trial court should have considered the market value of the business. We note, however, Jarvis stipulated to the value of the business, never informed the trial court she wished to raise an issue regarding its value, and chose not to present any evidence of its market value.

As a general rule, each party bears the obligation to raise issues and present evidence he or she wishes the court to consider. A party's failure to raise an issue results in the waiver of that issue. Likewise, it is not the basis for reversal that a party *elected* not to present certain evidence at trial but alleges on appeal that the trial court might have reached a different conclusion had the party chosen to present such evidence. "Reviewing courts have refused to reverse and remand dissolution cases wherein the complaining spouse (1) presented no evidence on the value of the parties' assets despite the presentation of such evidence by his spouse [citations]; (2) stipulated to the valuation evidence [citation]; or (3) gave or suggested the valuation evidence [citations]." *In re Marriage of Deem* (1984), 123 Ill. App. 3d 1019, 1023, 463 N.E.2d 1317, 1321.

In the present case, Jarvis and Dempsey, in their financial affidavits, agreed the value of the tavern was $55,000 subject to a lien in excess of $45,000. The trial court received testimony that the parties paid $55,000 for the tavern in 1989. Jarvis never testified to any other valuation of the tavern or amount of the loan, nor did she indicate to the court that she took issue with Dempsey's valuation of the tavern or loan. Finally, although five hearings were held on the ancillary issues over a six-month period, Jarvis never sought to introduce evidence regarding the market value of the business.

Essentially Jarvis would have us reverse because she now alleges that if she had another chance she would introduce different evidence. As the appellate court stated in *In re Marriage of Gluszek* (1988), 168 Ill. App. 3d 987, 993, 523 N.E.2d 126, 130:

"As a court of review, we cannot continue to reverse and remand dissolution cases where a party had an adequate opportunity to introduce evidence but failed to do so. A party should not be able to benefit on review from his failure to introduce

evidence at trial. (*In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 54, 448 N.E.2d 545, 550.) 'Remanding cases such as the one before us would only protract the litigation and clog the trial courts with issues which should have been disposed of at the initial hearing.' *Smith*, 114 Ill. App. 3d at 54-55, 448 N.E.2d at 550.''

As the parties agreed upon the value of the business, and the trial court was presented with the financial records and tax returns of the business, we find the trial court had sufficient evidence of the value of the business to be able to make an equitable distribution of the assets. Therefore, Jarvis will not be heard to complain she wished she would have introduced other evidence, but chose not to.

### III. CONCLUSION

The judgment of the circuit court of Vermilion County is affirmed.

Affirmed.

LUND and GREEN, JJ., concur.