*In re* MARRIAGE OF ALICE FERN SWANSON, Petitioner-Appellant, and ALLEN EUGENE SWANSON, Respondent-Appellee.

Fourth District    No. 4—95—0056

Argued September 19, 1995.—Opinion filed October 5, 1995.

Helen E. Ogar (argued), of Dunn, Ulbrich, Hundman, Stanczak & Ogar, of Bloomington, for appellant.

Alan I. Weintraub (argued), of Thomson & Weintraub, of Bloomington, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

Alice Fern Swanson, petitioner, and Allen Eugene Swanson, respondent, married in September 1981. In August 1985, twin boys, Gregory Eugene and Scott Allen, were born of this marriage. In January 1993, Alice filed a petition for dissolution of marriage, which the trial court granted in July 1993, reserving judgment regarding child custody, child support, maintenance, property distribution, and attorney fees.

In January 1994, the trial court conducted a custody hearing, and in April 1994, the court directed the parties to produce a joint parenting agreement within 30 days, pursuant to section 602.1(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.1(b) (West 1992)). The parties could not reach agreement, and in May 1994, the court entered an order of joint custody, including a joint parenting order drafted by the court. In November 1994, the trial court entered a supplemental judgment on the remaining issues.

Alice appeals, arguing that the trial court abused its discretion by (1) awarding joint custody, (2) incorrectly determining the amount of child support, (3) refusing to award maintenance, (4) undervaluing the Wapella Township property, and (5) failing to consider all statutory factors regarding property distribution.

We affirm in part, reverse in part, vacate in part, and remand.

## I. BACKGROUND

Alice is 39 years old and has an associate's degree from Illinois Central Junior College. She has worked as a clerk at the McLean County Law and Justice Center since 1992. The trial court determined

her monthly gross income to be $1,465, and her net income to be $1,102.

Prior to her marriage and before the twins were born, Alice worked at GTE Corporation (GTE) for 11 years. She was laid off during the latter part of her pregnancy, and she remained at home with the twins for the next $6^1/_2$ years, until the boys entered school.

Allen is 43 years old and has a master's degree from Illinois State University. He works for the City of Bloomington (City) as a traffic safety engineer. His gross monthly income is $3,875, and the trial court determined his statutory net income to be $2,679. Allen has worked for the City for over 13 years, including the period of the parties' marriage.

The evidence showed that Allen and Alice are both competent and loving parents. During the $6^1/_2$ years she stayed home with Greg and Scott, Alice was primarily responsible for their care. Once the twins began school, Alice assisted the kindergarten teacher one to two days a week as an unpaid assistant and was also active in the parent-teacher organization. She takes part in Indian Guides family activities with the twins and formerly participated in family outings to the Wapella Township property.

Allen participates in many sports activities with the twins and has coached or assisted with coaching the boys' soccer, basketball, and baseball teams. He has spent time hiking, fishing, and hunting with Greg and Scott, and the three of them belong to Indian Guides. He also attends school field trips with Greg and Scott.

During their marriage, the parties owned the marital home and were free of debt. They had an effective savings plan and were able to take family vacations. One of their investments was an interest in a parcel of land located in Wapella Township, De Witt County, Illinois. In 1990, Allen and Alice purchased approximately 10 acres of this parcel from Allen's sister and brother-in-law. The trial court valued this property at its purchase price and awarded it to Allen.

## II. JOINT CUSTODY

Alice argues that the joint custody order and the twins' shifting residence constitute an abuse of the trial court's discretion because they are not in the best interests of the children. We agree.

The trial court stated that a joint custody arrangement is rare and "is not the type of arrangement which should be imposed forcibly on either the children or the parents." Nevertheless, the court determined that the parties had "an unusual capacity to cooperate" and ordered joint custody of the children. When the parties failed to produce a joint parenting agreement, the trial court drafted one. The

court's joint parenting order established Alice's home as the twins' primary physical residence, and awarded visitation to Allen for the last 14 days of every month.

■ The statutory prerequisites for joint custody outlined in section 602.1(b) of the Act indicate the legislature's intent that joint custody be awarded only where the parents are willing to cooperate in the upbringing of their children. (*In re Marriage of Drummond* (1987), 156 Ill. App. 3d 672, 680, 509 N.E.2d 707, 713.) In 1986, the legislature amended the statute to eliminate the requirement that both parents agree to joint custody. Nevertheless, the statute still requires that the parents be able to "cooperate effectively and consistently with each other towards the best interest of the child." 750 ILCS 5/602.1(c)(1) (West 1992).

Section 602.1(c) of the Act sets forth the criteria for an award of joint custody, as follows:

"The court may enter an order of joint custody if it determines that joint custody would be in the best interests of the child, taking into account the following:

(1) the ability of the parents to cooperate effectively and consistently with each other towards the best interest of the child;

(2) [t]he residential circumstances of each parent; and

(3) all other factors which may be relevant to the best interest of the child." 750 ILCS 5/602.1(c) (West 1992).

Case law supports a joint custody award only in certain narrow circumstances. *Drummond* established the standards for joint custody as follows:

"The propriety of such an arrangement is dependent upon the following: the best interests of the child, agreement of the parents and their mutual ability to cooperate, geographic distance between the parents, desires of the child if of a suitable age, and the relationships previously established between the child and his parents." *Drummond*, 156 Ill. App. 3d at 679, 509 N.E.2d at 712.

In *In re Marriage of Manuele* (1982), 107 Ill. App. 3d 1090, 438 N.E.2d 691, this court discouraged the award of joint custody, specifically noting that such orders are usually unworkable and should rarely be entered. The court noted that unless parents have an unusual capacity to cooperate, substantial disagreement will likely arise, ultimately resulting in harm to the children. (*Manuele*, 107 Ill. App. 3d at 1094-95, 438 N.E.2d at 694.) As a result, in *Manuele*, we reversed and remanded the case with specific directions to have custody vested in one parent subject to visitation. (*Manuele*, 107 Ill. App. 3d 1090, 438 N.E.2d 691.) Courts have also reversed joint custody orders in *In re Marriage of Bush* (1989), 191 Ill. App. 3d 249, 547 N.E.2d 590, *Drummond* (156 Ill. App. 3d 672, 509 N.E.2d 707), *Kocal*

*v. Holt* (1992), 229 Ill. App. 3d 1023, 595 N.E.2d 169, and *In re Marriage of Pool* (1983), 118 Ill. App. 3d 1035, 455 N.E.2d 887, where the evidence showed that the parents had too much animosity to be able to cooperate.

In this case, the parties have not demonstrated an "unusual ability to cooperate." Alice does not want joint custody. Although Allen prefers sole custody for himself, he favors joint custody over Alice's having sole custody. In addition, Alice and Allen have participated in mediation several times since January 1993. Although they established some guidelines for raising Greg and Scott at their first mediation sessions in April 1993, subsequent mediation proved ineffective. The September 1993 report states that the parties had reached an impasse. Furthermore, in April 1994, the parties could not agree to a joint parenting order after the court ordered joint custody, and the mediator's April 1994 report states there is "no realistic likelihood that a mediated agreement as to the disputed issues could be achieved."

Alice testified that Allen had previously intimidated and frightened her to the extent that she requested police assistance twice and once sought refuge at a domestic abuse shelter. In addition, Allen's psychological test indicated that he is "rigid and inflexible."

Allen's conduct following the parties' first agreement provides evidence of his unwillingness to cooperate to the extent required by joint custody. The parties had agreed that both of them would continue to send the twins to the same day-care provider to promote stability in the boys' lives and to minimize the disruptive effect of their new living situation. In violation of this agreement, Allen unilaterally changed the boys' after-school schedule on the days he had custody. As a result, the boys were confused about their schedule and uncertain where they should go after school. More to the point, this episode indicates Allen's disregard for the arrangements the parties had mutually agreed to and formalized in a stipulation filed May 20, 1993.

Allen argues that the trial court's award of joint custody lies within its sound discretion, and he further asserts that the parties have been operating under a joint parenting arrangement since May 1993, with only "minor problems." Allen also testified that sometimes Alice did not keep him informed of the boys' activities. Allen points out that the children were thriving under the previous schedule that shifted the boys from one house to another twice monthly; their grades remained good, and their behavior and attendance at activities had not changed. Allen also offers as support for joint custody his

psychologist's testimony that, so far, there was no evidence that joint custody had harmed the children.

Joint custody requires an unusual level of cooperation and communication from both parents. In this case, the record indicates that the parties are either unable or unwilling (or both) to cooperate to the extent required by joint custody.

Even if the parties had shown an unusual capacity to cooperate, the Act states that the trial court may order joint custody only where it "determines that joint custody would be in the best interests of the child" (750 ILCS 5/602.1(c) (West 1992)), and the court must consider all relevant factors, including those specifically listed in section 602 of the Act. 750 ILCS 5/602 (West 1992).

Here, the joint parenting order named Alice the primary physical custodian but established a schedule whereby the boys would move between parents twice each month. Greg and Scott were scheduled to live with Alice the first half of each month and then move to Allen's home for the last 14 days of each month. We view this alternating custody schedule with particular disfavor. (See *In re Marriage of Oros* (1994), 256 Ill. App. 3d 167, 627 N.E.2d 1246.) In *Oros*, we terminated joint custody because the preschool child moved back and forth every three months. *Oros*, 256 Ill. App. 3d 167, 627 N.E.2d 1246.

Furthermore, the statute does not imply or presume that joint custody means each parent has equal time as physical custodian. (750 ILCS 5/602.1(d) (West 1992).) The order must give some permanency to the physical custody of the children and not simply attempt to equalize the time the children spend with each parent. Constantly shifting children between houses is detrimental. (*In re Marriage of Hacker* (1992), 239 Ill. App. 3d 658, 661, 606 N.E.2d 648, 651.) Children need a home base. In *Davis v. Davis* (1978), 63 Ill. App. 3d 465, 470, 380 N.E.2d 415, 418, the court rejected a custody arrangement that moved children back and forth, stating that "[t]he danger that the child will feel that he has no fixed or permanent home is particularly acute where, as here, the child is shifted every four months, including a move during the school term."

In the present case, the trial court described Allen and Alice as "model parents" and stated that the evidence did not support denying custody to either party. However, joint custody is not a substitute for making a difficult choice between two good parents. Particularly where alternating physical custody will occur, joint custody may add to the insecurity frequently experienced by children as a result of divorce.

We commend Allen for his involvement in the twins' lives.

However, we believe that he can remain an active participant in their lives without being designated a joint custodian. The close geographic proximity of the two parents' residences and Allen's participation in Indian Guides and the boys' sports activities ensure his continued involvement. In addition, Alice's support of the boys' involvement in those activities with their father demonstrates her willingness to encourage and facilitate the boys' contact with Allen. We likewise commend Alice on her extensive involvement with the twins' educational and other activities.

In this case, although the trial court could reasonably conclude that Alice and Allen are model parents *to their children*, they have not demonstrated an ability to cooperate *with each other* to the degree required for joint custody. Furthermore, the schedule shifting the children from one house to another twice a month is *not* in their best interests. Accordingly, we reverse the order of joint custody and remand with instructions to place the children with one parent subject to liberal visitation by the other.

## III. CHILD SUPPORT

■ Alice next argues that the trial court erred in determining the amount of child support. The court determined child support by applying the guidelines to each party's income and then taking into account the additional time that the children would live with Alice. It then offset these figures to arrive at a child support amount.

We vacate the trial court's determination of child support and remand for reconsideration after the court has determined custody on remand.

## IV. MAINTENANCE

Alice next argues that the trial court abused its discretion by failing to award maintenance. She argues that the trial court did not adequately consider the parties' standard of living while they were married, the difference in the parties' incomes, her needs, her educational background compared to Allen's background, and the fact that she stayed home with her children, rather than pursuing her career. In addition, Alice argues that Allen is well able to pay maintenance because (1) his income exceeds his expenses while her income is insufficient for her expenses, and (2) Allen received the majority of the income-producing property. See *In re Marriage of Cheger* (1991), 213 Ill. App. 3d 371, 379, 571 N.E.2d 1135, 1140.

The difference in the parties' earning ability is substantial. Alice has only an associate's degree; Allen has a master's degree in engineering. Although Alice worked at GTE for 11 years before the

parties' children were born, she returned to work only recently after staying home with the children for 6¹/₂ years. She reentered the work force in 1992 and now works as a clerk. In contrast, Allen has worked as a traffic safety engineer for the City for 13 years.

Allen contends that the court chose (1) to favor Alice in the property distribution and the attorney fees award, and (2) to transfer income from Allen to Alice by means of child support, rather than awarding maintenance.

■ The resources of the parties dictate whether they can maintain their life-style after dissolution. (*In re Marriage of Mantei* (1991), 222 Ill. App. 3d 933, 941, 583 N.E.2d 1192, 1197.) Most divorced couples do not have resources adequate to maintain two households at the same standard enjoyed prior to divorce, and one or both parties often need to change their life-style. Allen and Alice are no exception. Nevertheless, maintenance may be appropriate where a spouse is unable to earn enough to meet her needs, even if she is employed. *In re Marriage of Kristie* (1987), 156 Ill. App. 3d 821, 823, 510 N.E.2d 14, 15.

An award of maintenance involves an evaluation of the financial needs of both parties and is necessarily affected by a determination of child custody. (*In re Marriage of Sorenson* (1984), 127 Ill. App. 3d 967, 970, 469 N.E.2d 440, 442-43.) Thus, we need not address this issue now because a new child support award may affect the trial court's assessment of Alice's need for maintenance. We therefore vacate the trial court's decision regarding maintenance and remand for reconsideration.

## V. VALUATION OF THE WAPELLA TOWNSHIP PROPERTY

Alice next argues that the trial court abused its discretion in determining the value of the parties' Wapella Township property. The parties own a one-seventh interest in 71.28 acres of unimproved timberland in Wapella Township, De Witt County, Illinois. The parties purchased their interest in 1990 from Allen's sister for $9,442. The trial court's order on this issue reads as follows:

> "The Court finds that the 71.28 acres in Wapella Township is marital *** and that the appropriate value submitted by the parties is $9,442. Since there was no evidence of an appraisal on this property the Court finds that the purchase price most closely approximates its value at the time of the dissolution."

Allen admitted that the purchase was a "good deal." Furthermore, the property has been improved to some extent by clearing brush and construction of trails and bridges. Allen believed the property value had not changed substantially since the parties purchased it in 1990.

Alice testified that she believed the property was worth between $17,000 and $20,000, based on her conversations with unnamed realtors. Alice notes correctly that a property owner is generally competent to render an opinion as to the value of her property because property ownership usually indicates knowledge of the original price paid, improvements made, and the current state of the property. (*In re Marriage of Vucic* (1991), 216 Ill. App. 3d 692, 703, 576 N.E.2d 406, 413.) In *Vucic*, the appellate court held that testimony from an unnamed appraiser was insufficient evidence upon which to value property. (*Vucic*, 216 Ill. App. 3d at 703-04, 576 N.E.2d at 414.) In the absence of a formal appraisal, the trial court resolved the conflicting testimony in favor of Allen and decided that the purchase price most closely reflected the property's value.

■ The valuation of property is a question of fact that must be supported by competent evidence. (*Vucic*, 216 Ill. App. 3d at 703, 576 N.E.2d at 413.) This court will not reverse a trial court's determination of value unless it is contrary to the manifest weight of the evidence. (*Vucic*, 216 Ill. App. 3d at 703, 576 N.E.2d at 413.) In this case, the parties had owned the property for only three years before the dissolution proceedings and the improvements to the property were minor. In the absence of a formal appraisal, the record supports the trial court's valuation of the property.

## VI. PROPERTY DISTRIBUTION

Alice next argues that the trial court's property distribution constituted an abuse of discretion because it failed to consider statutory factors.

The trial court awarded the marital property as follows:

|  | Alice | Allen |
|---|---|---|
| Marital Home | $58,975 | |
| Vehicles | 8,250 | $ 7,240 |
| Checking and Saving | 229 | 32,999 |
| Savings bonds | 6,298 | 5,650 |
| IRA account | 10,733 | 8,795 |
| Cash value of insurance | 3,283 | |
| Wapella Township property | | 9,442 |
| Mutual funds | | 8,911 |
| Deferred Compensation | | 9,530 |
| Total | $87,768 | $82,567 |

In addition, the trial court awarded Alice $3,500 in attorney fees and allocated the VISA debt ($281) and the J.C. Penney debt ($114) to her.

Alice argues that she should have been awarded a greater share of the marital estate because the trial court (1) awarded most of the income-producing property to Allen, including savings accounts, certificates of deposit, and mutual funds, and (2) significantly undervalued the Wapella Township property, which it awarded to Allen.

The trial court must divide marital property in "just proportions" considering relevant factors listed in section 503(d) of the Act. (750 ILCS 5/503(d) (West 1992); *In re Marriage of Schmidt* (1993), 242 Ill. App. 3d 961, 966, 610 N.E.2d 673, 677.) Although the trial court must consider all relevant statutory factors, it need not make specific findings as to the reasons for its award. *Schmidt*, 242 Ill. App. 3d at 966, 610 N.E.2d at 677.

■ The basis of a proper property distribution is whether it is equitable. A division of marital property need not be equal to be equitable. (*Schmidt*, 242 Ill. App. 3d at 966, 610 N.E.2d at 677.) When awarding income-producing assets to one spouse becomes necessary, the trial court may achieve an equitable distribution by authorizing off-setting payments to the other spouse or by awarding a greater share of total marital assets to the spouse who does not receive the income-producing assets. (*In re Marriage of Jarvis* (1993), 245 Ill. App. 3d 1007, 1012, 614 N.E.2d 1294, 1298.) In the present case, Alice received $87,768 of the total marital estate plus $3,500 in attorney fees and $395 in debt, or 53% of the parties' marital assets.

A trial court's distribution of marital property should not be reversed absent a showing that the trial court abused its discretion. (*In re Marriage of Kerber* (1991), 215 Ill. App. 3d 248, 254, 574 N.E.2d 830, 834.) While we might have distributed assets differently, we cannot say that the trial court abused its discretion in its order distributing assets.

## VII. CONCLUSION

For the reasons stated, we affirm the trial court's valuation of the Wapella Township property and its distribution of marital property; we reverse and remand the joint custody order and physical shifting arrangement with directions; and we vacate the child support and maintenance determinations and remand for reconsideration. No further evidence need be taken.

Affirmed in part; reversed in part; vacated in part and remanded with directions.

McCULLOUGH and GARMAN, JJ., concur.