NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210108-U

NO. 4-21-0108

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 27, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| PAMELA WIEWEL, | ) | Circuit Court of |
|     Petitioner-Appellee, | ) | Adams County |
|     and | ) | No. 19D195 |
| DOUGLAS S. WIEWEL, | ) | |
|     Respondent-Appellant. | ) | Honorable |
| | ) | Holly J. Henze, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Knecht and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1  *Held*:  Respondent failed to establish the trial court's allocation of marital property amounted to an abuse of discretion.

¶ 2  In November 2020, the trial court entered a judgment dissolving the marriage of petitioner, Pamela Wiewel, and respondent, Douglas S. Wiewel, and allocating their marital and nonmarital property. Respondent appeals from the court's judgment, arguing it erred in its allocation of the marital property. Specifically, respondent contends the court erred in (1) ordering him to reimburse petitioner for $30,000 of a marital debt and (2) awarding petitioner sole ownership of the corporation they formed and owned jointly while married. We affirm.

¶ 3  I. BACKGROUND

¶ 4        Petitioner and respondent were married on March 13, 2010. Prior to their

marriage, the parties executed a prenuptial agreement which set forth their respective nonmarital

property, as that term is used in the Illinois Marriage and Dissolution of Marriage Act (Marriage

Act) (750 ILCS 5/101 *et seq.* (West 2008)). Petitioner's nonmarital property included, in relevant

part, a house valued at approximately $300,000 that was free of any encumbrances.

Respondent's nonmarital property included, in relevant part, a sole proprietorship, Building

Maintenance Service. Petitioner's nonmarital assets totaled approximately $1.3 million;

respondent's nonmarital assets totaled approximately $150,000.

¶ 5        Petitioner filed the instant petition for dissolution of marriage in September 2019.

The parties agreed that the prenuptial agreement controlled the disposition of their nonmarital

assets, but they failed to agree on an equitable division of their marital property. The two largest

marital assets consisted of Tangerine Dreams, Inc. (Tangerine Dreams), a corporation the parties

created in 2014 and owned jointly, and a contract for deed for an option to purchase a 58-acre

farm from respondent's father. Respondent filed a motion requesting an appraisal of Tangerine

Dreams because it was "necessary to assist the court in a division of the marital estate." The

court ordered that the property be appraised and the parties split the cost, but respondent never

had the corporation appraised. The parties also failed to have the farm appraised.

¶ 6        On November 2, 2020, the trial court conducted a hearing to divide the parties'

marital assets and debts. Petitioner testified that she and respondent formed Tangerine Dreams in

2014 to buy a bowling alley, the Tangerine Bowl. Tangerine Dreams purchased the bowling

alley on July 31, 2014, for $1.2 million. Prior to the purchase, the bowling alley was appraised at

$1.6 million. Tangerine Dreams subsequently purchased two residential properties next to the

bowling alley. The rental income from the properties went to the corporation. As of October 15,

2020, the net payoff on the mortgage on the bowling alley was $978,469 and the net payoff on the two residential properties was $226,260. Petitioner also testified that she loaned the corporation $93,000 out of her nonmarital assets, and she introduced into evidence checks totaling this amount. Petitioner worked at the bowling alley 50 to 70 hours per week and earned a $35,000 salary. She testified that due to the restrictions put in place due to the coronavirus pandemic, the Tangerine Bowl's income was "down $231,000 from the same time last year." According to petitioner, the restrictions prohibited "indoor dining and bar service," which accounted for "about a third of our income."

¶ 7        Petitioner also testified about a $40,000 home equity line of credit that she opened prior to the parties' marriage. The line of credit was secured by her nonmarital residence, but she did not draw on it until after the parties married. Petitioner introduced into evidence an exhibit showing that as of April 2, 2020, the principal balance on the line of credit was $34,038.64. She testified that the majority of this amount, $30,000, went to respondent to finance and purchase inventory for his nonmarital business, Building Maintenance Service. Petitioner acknowledged that she used the remaining $4000 for personal expenses and agreed that portion of the debt should be assigned to her. Petitioner testified that she had the checks to account for the $30,000 she gave to respondent, but those checks were never introduced into evidence.

¶ 8        Respondent was asked on direct examination about the money petitioner purportedly gave him for his nonmarital business, and the following exchange occurred:

> "Q. [D]id you use monies to buy coolers, is that correct? How many—
>
> A. I purchased—I'm sorry, I don't understand the question.
>
> Q. Were they coolers? A cooler? Or coolers? Or—
>
> A. Equipment?

Q. Yeah. Or equipment?

A. Yeah. There was some bought for my business and I had sold.

Q. Okay. Not to use but to sell in your business?

A. Right; buy and sell.

Q. Okay. Would you have sold those coolers?

A. Most likely, yes.

Q. Go back into your account or her account?

A. Put it back into the—part of it went into the business and then was distributed wherever.

Q. And do you know how much money she would have paid to purchase this equipment?

A. She never paid anything. She might have given me a few personal checks, but I don't recall her buying anything.

Q. Okay. Had you ever been asked by her to—or has she ever asked you to pay back any of this money?

A. We discussed the home equity loan credit, that we would probably pay it off if we sold her house to build a new house."

¶ 9    Respondent further testified that he "remodeled the bar, restaurant and kitchen" of the Tangerine Bowl and "did a lot of HVAC work." Respondent was never employed by Tangerine Dreams, but he was compensated for some of his labor. Respondent's pretrial affidavit shows that in 2018, he earned $28,347 from his nonmarital business and $36,000 from his employer, WCU Tower.

¶ 10        Following presentation of the evidence, the parties gave their closing arguments as to how the court should distribute the relevant marital property. Petitioner requested she be awarded all interest in Tangerine Dreams, which she believed had little to no value, respondent be awarded the option to purchase his father's 58-acre farm, and respondent be ordered to reimburse her for the $30,000 she gave to him for his nonmarital business. Respondent's counsel, on the other hand, stated the following in support of his request to have the trial court order a sale of Tangerine Dreams at some point in the future:

>   "MR. SCHUERING [(RESPONDENT'S COUNSEL)]: So, we're in a situation with COVID-19 and we requested you know at one [point] in time to split the cost of having it appraised but I think everybody would agree it's probably—*not probably—I would say it's worth less than what the purchase price was, but we don't know that.*
>
>   So, we're asking the Court to follow our recommendation in the pre-trial to let's keep it open, she can draw her salary out of it, she'll have a job, she'll be able to work with her employees, let's see what happens and contact some professionals about selling it. That's the fair thing to [do], I believe, for both parties here." (Emphasis added.)

¶ 11        In November 2020, the trial court entered its judgment dissolving the parties' marriage and allocating their marital and nonmarital property. The court awarded the parties their respective nonmarital property in accordance with the terms of the prenuptial agreement. In addition, the court ordered respondent "to reimburse the Petitioner the sum of $30,000 for loans made to the Respondent during the marriage for his non-marital business inventory purchases. The Respondent admitted they were loans to be repaid. The loans were secured by the

Petitioner's non-marital asset for the benefit of the Respondent's non-marital asset." The court also awarded all interest in Tangerine Dreams to petitioner. In a closing note, the court stated that it found the distribution to be fair and equitable in light of the parties' failure to present evidence "as to the current value of the marital assets."

¶ 12 Respondent filed a motion to reconsider in which he raised the same arguments he now raises on appeal. The trial court denied respondent's motion following a hearing.

¶ 13 This appeal followed.

¶ 14 II. ANALYSIS

¶ 15 On appeal, respondent argues the trial court erred in (1) ordering him to reimburse petitioner for $30,000 of a marital debt and (2) awarding all interest in Tangerine Dreams to petitioner.

¶ 16 A. Standard of Review

¶ 17 We review a trial court's division of marital property for an abuse of discretion. *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 700, 843 N.E.2d 478, 482 (2006). Under this standard, "the question is not whether the reviewing court agrees with the trial court but rather did the trial court in the exercise of its discretion act arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceed the bounds of reason." *In re Marriage of Lee*, 78 Ill. App. 3d 1123, 1127, 398 N.E.2d 126, 129 (1979). "This is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court." *Id.*

¶ 18 B. Reimbursement of $30,000 of a Marital Debt

¶ 19 First, respondent argues the trial court erred in ordering him to reimburse petitioner for $30,000 of a marital debt. Respondent contends the court failed to classify the debt

as marital or nonmarital and, assuming the court considered it to be a marital debt, failed to equitably allocate the debt.

¶ 20       Initially, we note respondent discusses at length whether the trial court found the $30,000 to be a marital or nonmarital debt. However, the record is clear that the court properly considered it to be a marital debt. Although the debt was mistakenly included in the "non-marital property" section of the court's judgment, the court clearly stated at the hearing on respondent's motion to reconsider that "it was a marital debt secured by a nonmarital asset." Thus, the question is whether the court properly allocated the marital debt.

¶ 21       Section 503(d) of the Marriage Act (750 ILCS 5/503(d) (West 2018)) "provides marital property shall be divided in 'just proportions' considering all relevant factors as well as others deemed relevant to the case." *In re Marriage of Cheger*, 213 Ill. App. 3d 371, 381, 571 N.E.2d 1135, 1142 (1991). That section lists twelve nonexclusive factors for the court to consider. See 750 ILCS 5/503(d) (West 2018). However, the court is not required to make express findings regarding each factor. See, *e.g.*, *In re Marriage of Swanson*, 275 Ill. App. 3d 519, 528, 656 N.E.2d 215, 222 (1995). "The touchstone of proper apportionment is whether a directed distribution is equitable in nature." *In re Marriage of Lee*, 78 Ill. App. 3d at 1132. "A division of marital property need not be equal to be equitable." *In re Marriage of Hart*, 194 Ill. App. 3d 839, 847, 551 N.E.2d 737, 741 (1990).

¶ 22       Here, the trial court ordered respondent to reimburse petitioner for $30,000 of the approximately $34,000 the parties drew upon from the home equity line of credit secured by petitioner's nonmarital asset. We cannot say that no reasonable person would agree that this was an equitable distribution of the debt. The evidence presented shows that as of April 2, 2020, the principal balance on the home equity line of credit was $34,038.64. Petitioner testified that she

used approximately $4000 of that amount for personal use and should therefore be responsible for that amount of the debt. Petitioner further testified that the remainder of the money was used by respondent to purchase inventory for his nonmarital business. Respondent's testimony corroborated, in part, petitioner's assertion. He acknowledged that petitioner gave him "a few personal checks" from the home equity line of credit to buy inventory for his nonmarital business. Moreover, although petitioner did not present checks at trial demonstrating she paid $30,000 to respondent, respondent never disputed this amount. Thus, we cannot say the court acted arbitrarily in dividing the $34,000 marital debt between the parties. A reasonable person could agree that it was equitable for each party to be responsible for the portion of the debt that was used strictly for their own personal and nonmarital purposes.

¶ 23                                    C. Tangerine Dreams

¶ 24        Next, respondent argues the trial court erred in awarding all interest in Tangerine Dreams to petitioner. He contends the court abused its discretion "in concluding it was impossible to rely on values to achieve a fair and equitable division" of the corporation. According to respondent, there was a "lot of evidence" to demonstrate the corporation had significant value.

¶ 25        "Valuation of a marital asset is a question of fact to be determined by the trial court." *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 36, 128 N.E.3d 1237. To determine the value, the court must have competent evidence before it. *Id.* "It is the obligation of the parties in a dissolution proceeding to present the court with sufficient evidence of the value of the property." *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 40, 77 N.E.3d 1000. "Neither party should be allowed to benefit on appeal from their own failure to introduce competent evidence of value at trial." *Hamilton*, 2019 IL App (5th) 170295, ¶ 45. In *In re*

- 8 -

*Marriage of Smith*, 114 Ill. App. 3d 47, 54, 448 N.E.2d 545, 550 (1983), the First District expanded on this notion as follows:

> "Despite the fact that numerous hearings regarding the division of property were held and that only a limited amount of property was involved, neither party presented the trial court with solid evidence of the properties' value so that the court could make the fairest possible division of the parties' assets. We again emphasize that it is the parties' obligation to present the court with sufficient evidence of the value of the property. Reviewing courts cannot continue to reverse and remand dissolution cases where the parties have had an adequate opportunity to introduce evidence but have failed to do so. Parties should not be allowed to benefit on review from their failure to introduce evidence at trial."

¶ 26        Here, prior to the property division hearing, respondent filed a motion requesting an appraisal of Tangerine Dreams because it was "necessary to assist the Court in a division of the marital estate." The court ordered that the property be appraised and the parties split the cost, but respondent never had the corporation appraised. At the hearing, the court explicitly cautioned the parties about proceeding without an appraisal:

> "THE COURT: We're doing it very blindly. 5 to $6,000 [for an appraisal] is a lot of money. I think we all can agree to that. And the average divorce that comes through here, the parties couldn't have afforded such an appraisal, but when we're talking about a million dollars worth of assets and nonmarital assets, $6,000 seems to have been a good investment to get this appraised—

MR. SCHUERING: We asked—

THE COURT: —if your client is asking for a share of it; asking that it be awarded to him or—I should say asking that somehow that value be divided, but I don't know. I don't know what it's worth."

Later during the hearing, the court again had a similar exchange with respondent's counsel:

"MR. SCHUERING: Well, we don't—the problem we have is we don't have any appraisal of it, and that's a big handicap. I don't know how the Court can even speculate as to what it's supposed to be.

THE COURT: I'm not the one who brought the order to me setting it today. I just signed it.

MR. SCHUERING: And—

THE COURT: I don't push cases to trial unless there's [*sic*] children involved, and this one I wasn't pushing."

¶ 27 Based on the above, it is clear respondent had ample opportunity to have the corporation appraised. Nonetheless, and despite numerous warnings from the court, respondent made the conscious decision to proceed to the disposition hearing without an appraised value. He therefore cannot now complain to this court about the trial court's valuation when it was his obligation to present the court with competent evidence. See *id.* Were we to entertain respondent's argument on appeal, we would be allowing him to benefit from his own failure to present evidence, in violation of a well-settled principle of law. See *id.*

¶ 28 Based on the evidence presented, we cannot say the trial court's award of Tangerine Dreams to petitioner was an abuse of discretion. The parties purchased the bowling alley in 2014 for $1.2 million. Although respondent testified to the cost of subsequent

improvements, there was no evidence establishing what, if any, added value resulted. As of the time of the court's division of property, the payoff on the mortgage was around $978,000. Petitioner testified that income from the bowling alley was significantly reduced due to the pandemic. Further, respondent's counsel admitted during closing argument that Tangerine Dreams was "worth less than what the purchase price was" in 2014. Taken together, and in the absence of an appraisal of either Tangerine Dreams or the farm, the evidence supports the court's decision.

¶ 29                                III. CONCLUSION

¶ 30          For the reasons stated, we affirm the trial court's judgment.

¶ 31          Affirmed.