*In re* MARRIAGE OF KATHY SUE MARSHALL, Petitioner-Appellant, and SHELDON NUSSBAUM, Respondent-Appellee (Heidi Nussbaum *et al.*, Contemnors-Appellants).

Third District   Nos. 3—95—0530, 3—95—0535 cons.

Opinion filed April 4, 1996.

Gregory A. Adamski (argued), Karen Conti, and Catherine Connolly, all of Adamski & Conti, of Chicago, for appellant Kathy Sue Marshall.

Richard B. Orloff (argued), of Mason, Orloff, Reich, Troy & Thanas, of Joliet, for appellee.

Denise Grabavoy, of Bolingbrook, guardian *ad litem*.

Benjamin S. Wolf, of The Roger Baldwin Foundation of ACLU, Inc.,

Bruce A. Boyer, of Children & Family Law Center, and Jonathan K. Baum and Jaye Quadrozzi, both of Katten, Muchin & Zavis, all of Chicago, for *amicus curiae.*

JUSTICE LYTTON delivered the opinion of the court:

These consolidated appeals arise from a dispute over child visitation. The mother, Kathy Marshall, appeals from the denial of her petition to modify the visitation rights of the father, Sheldon Nussbaum. Kathy and Sheldon's minor children, Heidi and Rachel, appeal a circuit court finding that they were in direct civil contempt for refusing to go to North Carolina to visit Sheldon. For the reasons stated below, we affirm the ruling denying modification of visitation, affirm the finding of contempt against the minors, but reverse the sanctions imposed and remand for further proceedings.

## I. FACTS

Kathy and Sheldon were married in January 1982 and resided in North Carolina. The couple had two children. Heidi was born in December 1982, and Rachel was born in December 1986. In February 1990, the couple separated and Kathy commenced dissolution proceedings.

The record shows that, from the onset, the litigation between Kathy and Sheldon was acrimonious. Each party alleged that the other was guilty of physical and psychological abuse. In three separate pleadings—filed in May 1990, April 1991 and December 1991— Sheldon alleged that Kathy was improperly denying him visitation.

Kathy moved with the children to Illinois in November 1991. A judgment of dissolution of marriage was entered in North Carolina in 1992. In a separate order, entered in April 1993, Kathy was awarded custody of the children. Under the visitation schedule, Sheldon was to have the children in North Carolina for five to six weeks in the summer, every Christmas and every other spring break.

The girls visited their father during the summer of 1993 and for about a week at Christmas; however, Kathy did not send the girls for their spring break visit in April 1994. Sheldon brought a contempt action in North Carolina. In May 1994, Kathy filed a petition in the circuit court of Will County, Illinois, seeking to enroll the North Carolina judgment and restrict Sheldon's visitation rights. Sheldon brought another contempt action when the girls did not come to North Carolina for their summer visitation in 1994.

On September 28, 1994, the North Carolina court declined to exercise further jurisdiction and transferred Sheldon's contempt actions to Illinois to be heard with Kathy's petition to modify.

In late February and early March 1995, an extended hearing was

held in the circuit court of Will County. Kathy presented the testimony of a psychologist, Dr. Eleanore A. Ryan. Ryan testified that she was contacted by Kathy in February 1994. Kathy told her that Heidi had been experiencing behavioral problems both at home and at school in the past month. Kathy also reported that Heidi had recently run away from home.

Ryan met with Heidi on February 26, 1994. Heidi said that during the recent Christmas visitation in North Carolina, her father woke her up every night and said that it was father/daughter time. Heidi told Ryan that her father would keep her up until 4 o'clock in the morning. Heidi said that her father also kept her up nights during the summer visitation in 1993. Heidi also told Ryan she had received a rifle from her father for Christmas, and they went hunting. She claimed that her father forced her to shoot a bird. Heidi told Ryan that she began hearing voices after this visit with her father.

Ryan met with Heidi a second time on March 12, 1994. At this meeting, Heidi said that she was afraid of her father and she was concerned about the upcoming spring break visit. Heidi expressed the fear that if she went to North Carolina, her father would not allow her to return to Illinois. Based on Heidi's fears, Dr. Ryan recommended to Kathy that neither child go to North Carolina for the visit scheduled to start April 1, 1994.

In the meantime, Sheldon had mailed airline tickets to Kathy. Kathy did not call Sheldon until the morning the children were to leave for North Carolina. Sheldon had already gone to the airport.

Ryan met with Heidi nine more times between April 1994 and the hearing in February 1995. During these meetings, Heidi claimed that her father repeatedly stated that her mother and maternal grandparents were evil. He said things would be better if she came and lived with him. Heidi related that her father made her repeat things over and over. Heidi also told Ryan that she had run away from home on February 19, 1994, because her father had told her to do so.

At the hearing, Ryan opined that Heidi was suffering from post-traumatic stress disorder resulting from contacts with her father. Ryan testified at the hearing, "I feel that to schedule any kind of visitation at this point would be very threatening for Heidi, would reduce the feelings of security that she currently has." Ryan testified she interviewed Rachel on three occasions in late 1994 and early 1995. She diagnosed Rachel as suffering "adjustment disorder with mixed emotional features." Ryan opined there should be no visitation with the father at that time.

Kathy Marshall testified that she noted behavioral differences in

Heidi following the Christmas visit in 1993. After the February 19, 1994, incident in which Heidi ran away from home for several hours, Heidi began telling her mother that she was hearing voices. Kathy decided to seek professional help and contacted Dr. Ryan.

Kathy also testified that Heidi had told her about an incident, during the 1993 Christmas visit, when Sheldon was going to spank Rachel for crying for her mother. Heidi said that she grabbed her father's arm and told him not to spank Rachel. Heidi stated that her father chased her until she hid behind a waterbed, where he tried to hit her with a stick.

Heidi asked Kathy not to send her back to North Carolina. Heidi stated that she was afraid of her father and he said she would not be allowed to return to Chicago.

On cross-examination, Kathy conceded that just prior to Heidi's running away, Heidi had been grounded by her mother for failing to give Kathy a note from Heidi's gym teacher. Kathy also conceded that it made no sense for Heidi to run away to be with her father if she was afraid of him.

Sheldon Nussbaum testified to events surrounding the girls' visitation in the summer of 1993 and at Christmas. Sheldon testified he took each of the girls hunting during their Christmas visit. He took the girls out separately; when he went with seven-year-old Rachel, they did not take any guns. Sheldon denied giving Heidi a rifle, although he did let her use one of his guns. He said it was Heidi's idea to shoot the bird.

He admitted waking Heidi up, but testified that this was at Heidi's request because she wanted to stay up later than Rachel. Therefore, after Rachel would fall asleep, Heidi would get up. Heidi and he would eat popcorn, watch videos and "shoot the bull." Sheldon said that they may have discussed Kathy Marshall, but he denied telling Heidi that her mother and grandparents were evil.

Sheldon also confirmed the incident where he went to spank Heidi and she hid behind the waterbed. He stated that he tried to get her to come out from behind the headboard by "[laying] a guilt trip on her."

He testified that he spoke with Heidi on either February 18 or February 19, 1994. Heidi told him that she planned to run away from home. She was upset because she had been grounded. Heidi went into detail about her plans to run away, but Sheldon did not consider it a serious threat since she said she only planned to hide in the shed or go to a friend's house. He advised her that if she was going to leave she should go to her friend's house. He then tried calling the next day and got no answer. Sheldon further testified that after February 19, he noted a change in Heidi's attitude toward him.

The court interviewed Rachel and Heidi *in camera*. Rachel stated that she "kind of missed" seeing her dad. She spoke of being spanked when she cried for her mother. Rachel also stated that her father said he was going to keep them in North Carolina and not let them see their mother again.

Heidi told the judge that she did not want to see her father. She said that she ran away in February 1994 because her father told her to run away. She claimed to be afraid of her father. She described how her father spanked Rachel for crying. Heidi stated that when she tried to prevent her father from spanking Rachel, her father backhanded her and she got a black eye.

Heidi spoke about the late-night conversations in which her father said that her mother and grandparents were wicked and everyone on her mother's side of the family molested each other. Heidi claimed that she began hearing voices after her summer visit in 1993. She did not tell her mother about the voices because she was afraid her mother would think she was crazy. Heidi told the court she would run away if ordered to go to North Carolina.

On May 10, 1995, the circuit court issued an order denying Kathy's petition to modify visitation. The court found there was no evidence that visitation with Sheldon would seriously endanger the children's physical or moral health. The court noted that visitation had been going on for more than a year prior to 1994 with no complaints from either girl. The court found Dr. Ryan's testimony "nonsensical" and "less than credible." The court ordered that Dr. Ryan have no further input with respect to the counseling of the children.

The court believed that Heidi made up stories at the time she ran away to place blame on her father. The court ordered the parties to seek further counseling for the children. If the parties could not agree on a counselor, the court would appoint one. The court also found Kathy in contempt on the motions initially filed in North Carolina in 1994.

The parties were unable to agree to a counselor to help facilitate visitation. On June 5, 1995, the court appointed Dr. Patricia Miller. Kathy filed a motion to reconsider or, in the alternative, to modify or vacate the order denying modification and holding her in contempt.

On June 13, 1995, the court entered an order which directed Kathy to send the children to North Carolina that day. The children did not go. Sheldon then filed a petition for rule to show cause why Kathy should not be held in criminal contempt.

At a status call held on Kathy's motion to reconsider and Sheldon's petition for criminal contempt, the judge noted he had spoken

with Dr. Miller. The parties agreed that Sheldon would travel to Illinois to meet with the children in Miller's office on July 12, 1995. The court stated that it was the court's intention that, at the conclusion of this meeting, the children would leave with Sheldon for their summer visitation in North Carolina.

Dr. Miller's report, filed on July 13, 1995, recommended that the girls not leave on their summer visit until a specific plan was fully established and agreed to by the parties. On that date, the court ordered the parties to cooperate with Miller to obtain additional counseling sessions through July 17, 1995, to facilitate the children's visitation with their father.

On July 18, 1995, the court again interviewed the children *in camera.* Both children were adamant that they were not going. They strongly expressed their beliefs that the court was wrong. Heidi stated that she would "pitch a fit" if forced to go to North Carolina. Rachel told the judge, "I think you must have a very sick sense of humor." After the court indicated that the girls must go with their father, Rachel responded, "You *** just made the biggest mistake probably ever you could have made." When the judge reiterated his decision, Heidi added, "It's not that simple."

At the conclusion of the hearing, the court ordered the children placed in the custody of their father for purposes of going to North Carolina. The order further stated that if the girls refused to cooperate, the Department of Children and Family Services (DCFS) was ordered to take the children into custody and bring them back to the court. The children did not go with their father, and DCFS took custody.

The next day, July 19, 1995, during a hearing on an emergency motion filed by Kathy, the court returned the children to the custody of their mother. The court appointed a guardian *ad litem.* In addition, the court *sua sponte* ordered a hearing be held to determine whether the children should be held in direct civil contempt of court.

On July 21, 1995, the circuit court denied Kathy's motion to reconsider. On July 24, 1995, Sheldon filed a petition asking the court to find Kathy in contempt for failing to pay certain monies over to Sheldon and his attorney.

Also on July 24, 1995, a hearing was held on whether Heidi and Rachel should be held in direct civil contempt. Dr. Miller recommended further counseling. Also, in an attempt to allay the girls' fears about being alone with their father for the summer, Miller proposed contacts with counselors and/or family members while the girls were in North Carolina. The court questioned Heidi and Rachel about their counseling sessions and contacts with their father in the

previous week. When the court asked the girls if they were going to cooperate and go to North Carolina, both girls responded that they refused to go.

The court found both Rachel and Heidi to be in direct civil contempt. The court "grounded" Rachel and ordered that she not leave her mother's home. Rachel could not watch television or have friends over to the house, but she could read and do crafts. The court ordered Kathy to enforce these measures. The court placed Heidi in a juvenile detention facility until she agreed to go to North Carolina. The judge indicated that the girls' conduct arose from the efforts of adults to manipulate the system.

Kathy filed an appeal from the order denying her motion to modify visitation. The children, by their guardian *ad litem*, filed an appeal from the judgment finding them in direct civil contempt. This court stayed the judgment of contempt and sanctions. The cases were consolidated for purposes of appeal and disposition.

## II. ANALYSIS

## A. VISITATION

On appeal, Kathy argues the circuit court erred in denying her petition to modify visitation and her motion to reconsider. Kathy argues the evidence is overwhelming that Sheldon posed a danger to Heidi and Rachel.

■ Matters of child visitation privileges rest largely in the broad discretion of the trial court, and its determinations with respect thereto should not be disturbed on appeal unless a manifest injustice has been done. *Rodely v. Rodely*, 28 Ill. 2d 347, 350, 192 N.E.2d 347, 349 (1963). The court may modify an order granting or denying visitation rights whenever modification would serve the best interest of the child, but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral or emotional health. 750 ILCS 5/607(c) (West 1994). Where the proceeding is by a custodial parent to restrict or deny visitation, the burden is upon the custodial parent to prove by a preponderance of the evidence that the visitation then provided endangers the welfare of the children. *Griffiths v. Griffiths*, 127 Ill. App. 3d 126, 129, 468 N.E.2d 482, 485 (1984).

■ In this case, the trial court ruled that Kathy failed to prove Sheldon posed a danger to the children. The court believed that the allegations against Sheldon arose from Heidi's trying to avoid getting in trouble for running away on February 19, 1994. The court found that the children were being manipulated by the actions of the adults, and Dr. Ryan's testimony was not credible. Determinations of cred-

ibility, the weight to be given testimony and reasonable inferences to be drawn from the evidence are the province of the trier of fact. *People v. Jimerson*, 127 Ill. 2d 12, 43, 535 N.E.2d 889, 903 (1989). After thoroughly reviewing the record, we do not find that the circuit court's decision was against the manifest weight of the evidence or constituted an abuse of discretion.

## B. CONTEMPT—JURISDICTION OVER THE MINORS

Heidi and Rachel assert that the circuit court erred in holding them in direct civil contempt. The children contend that they were not subject to contempt proceedings since they were not formally named as parties in the divorce case. We disagree.

### 1

■ The power of a court to hold a person in contempt is not limited by the formal designation of the parties. Illinois courts have long held that an order may be binding not only upon the parties to the suit but also upon all persons who had actual notice of the order and its contents. *People ex rel. Scott v. Master Barbers & Beauty Culturists Ass'n*, 9 Ill. App. 3d 981, 985, 293 N.E.2d 393, 397 (1973), citing *O'Brien v. People ex rel. Kellogg Switchboard & Supply Co.*, 216 Ill. 354, 367, 75 N.E. 108, 113 (1905). On numerous occasions, the appellate court has affirmed contempt findings against nonparties. See *People ex rel. Burris v. Maraviglia*, 264 Ill. App. 3d 392, 402, 636 N.E.2d 717, 725 (1993) (attorney held in contempt for failing to file documents as ordered by the court); *National Metalcrafters v. Local 449, United Automobile, Aerospace & Agricultural Implement Workers AFL-CIO*, 125 Ill. App. 3d 399, 407, 465 N.E.2d 1001, 1007-08 (1984) (nonparty picketer held in contempt for violating injunction); *People v. Kennedy*, 43 Ill. App. 2d 299, 302, 193 N.E.2d 464, 466 (1963) (in juvenile delinquency proceedings, stepfather of minor held in contempt for striking child, thereby interfering with the maintenance of the court's power and dignity).

■ In this case, Heidi and Rachel possessed knowledge as to the nature and contents of the visitation order. At three separate hearings, the judge explained the terms of the order and the need for the girls to comply. Nonetheless, they refused. The judge ruled that Heidi and Rachel understood their obligations under the visitation order. We will not second-guess this determination.

In addition to the knowledge requirement, a nonparty must have a legally sufficient relationship with a party. Under the common law, "a decree of injunction not only binds the parties *** but also those identified with them in interest, in 'privity' with them, represented by them or *subject to their control*." (Emphasis added.) *Golden State*

*Bottling Co. v. National Labor Relations Board,* 414 U.S. 168, 179, 38 L. Ed. 2d 388, 400, 94 S. Ct. 414, 422-23 (1973); *Travelhost, Inc. v. Blandford,* 68 F.3d 958, 966 (5th Cir. 1995).

Under this standard as well, Heidi and Rachel were bound by the visitation order. At all times pertinent herein, the girls' mother was a party bound by the terms of the visitation order, and she served as custodial parent. A custodial parent possesses authority to "determine the child's upbringing" (750 ILCS 5/608(a) (West 1992); *In re Marriage of Ivey,* 261 Ill. App. 3d 200, 207-08, 632 N.E.2d 510, 515-16 (1994)), and thus exercises "control over the child" (*In re Marriage of Haslett,* 257 Ill. App. 3d 999, 1008, 629 N.E.2d 182, 188 (1994)). Since Heidi and Rachel were subject to the control of a party, they too were bound by the visitation order.

## 2

■ The trial court also possessed jurisdiction over Heidi and Rachel pursuant to section 4 of the Uniform Child Custody Jurisdiction Act (UCCJA) (750 ILCS 35/4 (West 1992)). Section 4 applies to cases where another state declines to exercise jurisdiction on the ground that Illinois is the more appropriate forum to determine custody (750 ILCS 35/4(a)(4)(West 1992)), as well as original proceedings filed in Illinois (750 ILCS 5/601(a) (West 1992)). "Custody determinations" include court decisions and orders regarding visitation rights. 750 ILCS 35/3.02 (West 1992); *In re Marriage of Rogers,* 141 Ill. App. 3d 561, 564, 490 N.E.2d 1000, 1003 (1986).

Section 4(a) of the UCCJA provides that the jurisdiction of a circuit court to make custody and visitation determinations is determined by the home state and physical presence of the child, the existence of significant connections between this state and the child, and the availability of evidence in this state about the child. 750 ILCS 35/4(a) (West 1992); *Rogers,* 141 Ill. App. 3d at 564, 490 N.E.2d at 1002-03.

Once the necessary showing has been made under section 4(a), the court obtains "jurisdiction over [the] child" and the child is one of the "parties to the action." 750 ILCS 35/4(b) (West 1992); *In re Marriage of Hilliard,* 178 Ill. App. 3d 620, 624, 533 N.E.2d 543, 545 (1989). Jurisdiction over a person is the court's power to bind a particular person to its judgment. *In re Vaught,* 103 Ill. App. 3d 802, 804, 431 N.E.2d 1231, 1233 (1981); *Rensing v. Turner Aviation Corp.,* 166 F. Supp. 790, 794 (N.D. Ill. 1958). Once a court acquires jurisdiction over the person, that jurisdiction continues until all issues of fact and law are determined (*Whitley v. Lutheran Hospital,* 73 Ill. App. 3d 763, 766, 392 N.E.2d 729, 733 (1979)) or the court concedes jurisdiction to another state (750 ILCS 35/4(b) (West 1992)).

In this case, Kathy filed a petition seeking to enroll the divorce and modify visitation in Will County. Once the North Carolina court conceded jurisdiction to Illinois, the circuit court of Will County obtained jurisdiction over Rachel and Heidi.

In accordance with section 12 of the UCCJA (750 ILCS 35/12 (West 1994)), the judge ordered that the children appear personally before the court, and the girls did appear. The judge explained the terms of the visitation order and stressed the need for compliance. The judge also appointed an attorney to act as the girls' guardian *ad litem*. Thus, the court possessed jurisdiction over Heidi and Rachel, and the minors received sufficient notice pursuant to sections 4 and 12 of the Act.

## C. CONTEMPT—DUE PROCESS

Next, Heidi and Rachel contend that the judge erred in summarily punishing them without affording them the full panoply of rights afforded persons facing indirect contempt proceedings. Again, we disagree.

■ A contemnor may be dealt with summarily without the formality of pleadings, notice and hearing when the actions constitute direct contempt. *People ex rel. Chicago Bar Ass'n v. Barasch*, 21 Ill. 2d 407, 410, 173 N.E.2d 417, 419 (1961). Direct contempt occurs when contumacious acts take place in the presence of the court (*In re Marriage of Betts*, 200 Ill. App. 3d 26, 47, 558 N.E.2d 404, 418 (1990)), or when the acts are committed outside the presence of the judge but are admitted in open court (*People ex rel. Chicago Bar Ass'n v. Barasch*, 406 Ill. 253, 255, 94 N.E.2d 148, 149 (1950); *People v. Harrison*, 403 Ill. 320, 324, 86 N.E.2d 208, 210 (1949); see also *Cesena v. Du Page County*, 201 Ill. App. 3d 96, 113, 558 N.E.2d 1378, 1389 (1990) ("when the alleged contemnor admits such an indirect contempt in court, it may be punished as a direct contempt"), *rev'd on other grounds*, 145 Ill. 2d 32, 582 N.E.2d 177 (1991)). A refusal in open court to comply with a previously entered court order also constitutes direct contempt. *Betts*, 200 Ill. App. 3d at 47, 558 N.E.2d at 418.

In the presence of the trial judge, Heidi and Rachel admitted that they had previously refused to comply with the visitation order and then refused again to comply. Accordingly, they were properly held in direct contempt and dealt with summarily.

## D. CONTEMPT—SANCTIONS

■ Although we have concluded that the trial judge properly held Heidi and Rachel in direct civil contempt, we find it necessary to reverse the sanctions imposed and remand this cause for further proceedings.

Juvenile contemnors may be punished for contumacy. *In re Baker*, 71 Ill. 2d 480, 485, 376 N.E.2d 1005, 1007 (1978). In *Baker*, the supreme court affirmed a finding of contempt against a 14-year-old girl who willfully refused to remain at a children's home, since a factual basis existed for the ruling and the judge made a specific finding that an alternative remedy was "without sufficient deterrent effect." *Baker*, 71 Ill. 2d at 485, 376 N.E.2d at 1007.

However, in *Chicago Board of Education v. Terrile*, 47 Ill. App. 3d 75, 80, 361 N.E.2d 778, 782 (1977), the court reversed the commitment of a truant because the record was devoid of evidence that commitment was the least restrictive alternative. Specifically, there was no showing as to what alternatives to commitment were available, which of these alternatives were investigated, and why the investigated alternatives were not suitable to meet the needs of the respondent. *Terrile*, 47 Ill. App. 3d at 80, 361 N.E.2d at 782. As the court explained:

> "[T]he State may not pursue a governmental purpose, albeit legitimate and substantial, by means which abridge fundamental liberties more broadly than necessary. The purpose must be achieved by means of the least restrictive viable alternative." *Terrile*, 47 Ill. App. 3d at 79, 361 N.E.2d at 781.

Commitment of a minor constitutes a substantial abridgment of personal liberty. *Terrile*, 47 Ill. App. 3d at 80, 361 N.E.2d at 782.

After finding Heidi and Rachel to be in direct civil contempt, the trial judge did not indicate that he considered less restrictive alternatives that might have resulted in visitation. Since the purpose of a civil contempt proceeding is to compel prospective compliance for the benefit of a party to the litigation (*Betts*, 200 Ill. App. 3d at 43-44, 558 N.E.2d at 415-16), a judge should consider all reasonable alternatives for enforcing visitation rights. *Such alternatives are not necessarily limited to the contempt proceedings against the minors.*

For instance, one possible alternative is contempt proceedings against the custodial parent. The record shows that on May 10, 1995, Kathy was found to be in contempt for violating the visitation order, and she did not appeal the finding. Two more contempt petitions are presently pending against Kathy in the court below. Should the present situation persist, the trial court might consider whether the mother is continuing to contumaciously interfere with the visitation order.

In *Doggett v. Doggett*, 51 Ill. App. 3d 868, 366 N.E.2d 985 (1977), the children claimed that their father had abused them and refused to visit him. The trial court rejected the abuse allegations, held the mother in contempt and modified the visitation order to require the

mother "to deliver the children to her former husband's home at the beginning of each visitation period and to call for them at its completion." *Doggett*, 51 Ill. App. 3d at 872, 366 N.E.2d at 988. The appellate court affirmed. Noting that "ultimate responsibility" for compliance with the visitation order rests with the custodial parent, the appellate court held that the mother "cannot escape her duty to comply with the provisions of the decree by attempting to shift this burden to the discretion of her children or to some other person." *Doggett*, 51 Ill. App. 3d at 872, 366 N.E.2d at 988. If Kathy has failed to comply with her duties under the visitation order, the judge could sanction her appropriately.

Indeed, the judge may utilize a range of options to compel compliance with the visitation order. The determination as to which alternatives would be appropriate and efficacious is best left to the discretion of the trial court. We merely direct that applicable alternatives should be considered before incarcerating a minor for failing to comply with a visitation order.

We reverse the sanctions imposed and remand this cause for a new hearing. However, this should not be construed as a criticism of the manner in which the trial judge conducted himself. Heidi and Rachel's words and conduct were disrespectful to the court, and the judge demonstrated patience and an even temperament throughout the proceedings.

Hopefully, during the pendency of this appeal, the parties have come to realize that noncompliance with visitation orders can carry grave legal and emotional consequences for parents and their children.

## E. ISSUANCE OF MANDATE

■ Because of the nature of this case, the need for prompt compliance with the trial court's orders and the possible need for judicial supervision over the visitation process, we direct the clerk of the appellate court to issue the mandate *instanter* and contemporaneously with the filing of this opinion. We so order pursuant to authority granted us by Supreme Court Rule 368(a). 134 Ill. 2d R. 368(a); *In re Marriage of Nolte* (1993), 241 Ill. App. 3d 320, 330-31, 609 N.E.2d 381, 388.

## III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Will County denying Kathy Marshall's petition to modify visitation is affirmed. The order finding Heidi and Rachel Nussbaum in direct

civil contempt is affirmed; however, the sanctions imposed are reversed and this cause is remanded for further proceedings.

Affirmed in part; reversed in part and remanded for further proceedings.

McCUSKEY and SLATER, JJ., concur.