2025 IL App (1st) 251029-U

Fourth Division
Filed December 31, 2025

No. 1-25-1029

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| *In re* MARRIAGE OF | ) |
| ROHIT SUNGHAY, | ) Appeal from the |
|     Petitioner-Appellee, | ) Circuit Court of Cook County |
| and | ) No. 13 D5 30753 |
| SHWETHA R. SUNGHAY, n/k/a | ) The Honorable Bernadette Barrett, |
| SHWETHA R. MANJUNATH, | ) Judge, presiding. |
|     Respondent-Appellant. | ) |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Navarro and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court's order did not include a valid purge provision, and the findings of contempt must be vacated. The circuit court did not err when it continued joint decision-making.

¶ 2     The respondent, Shwetha Sunghay, appeals from the circuit court's order finding her in indirect civil contempt for failing to comply its May 12, 2014 custody agreement and order. On appeal, Shwetha argues the contempt order should be reversed because: (1) her due process rights were violated, (2) the findings of contempt were against the manifest weight of the evidence, and (3) the order did not contain a valid purge provision. Shwetha also argues the circuit court erred

when it continued joint decision-making. For the stated reasons, we vacate in part and affirm in part.[1]

¶ 3                                                 I. BACKGROUND

¶ 4        Rohit Sunghay and Shwetha were married in 2002 and have one child, A.S. They divorced in 2014 and established an agreed custody judgment and marital settlement agreement. According to the agreement, Rohit and Shwetha share joint legal care, custody, and control of A.S., with Shwetha designated as the residential parent. Rohit has parenting time every Tuesday from daycare or school pick-up until Wednesday at 7:30 a.m., every Thursday from daycare or school pick-up until 6:30 p.m., and alternating weekends from Friday after daycare or school pick-up until Sunday at 3:00 p.m. Additionally, Rohit and Shwetha are required to communicate with each other regarding major decisions, including those related to education, religion, medical care, and extracurricular activities.

¶ 5        Rohit filed three petitions for rules to show cause. On November 16, 2018, Rohit filed his first petition for rule to show cause. Rohit alleged that Shwetha was engaging in conduct that restricted and interfered with his parenting time. Further, Rohit alleged that Shwetha failed to communicate with him regarding A.S.'s educational, religious, and social and extracurricular activities. Along with the petition, Rohit sought an order requiring Shwetha to comply with the custody agreement.

¶ 6        On May 8, 2020, Rohit filed his second petition for a rule to show cause. Rohit alleged that he had not had parenting time since March 31, 2020, and had not had phone contact with A.S. since April 10, 2020. Rohit also alleged that Shwetha spoke negatively about him in A.S.'s presence.

---

[1]   Notice of appeal was filed June 2, 2025. The parties sought and received several unopposed extensions to complete briefing. We therefore find that there is good cause for issuing our decision more than 150 days after the notice of appeal was filed. See Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

¶ 7 Rohit filed his third petition for a rule to show cause on August 18, 2021. Again, Rohit alleged that Shwetha was denying him his parenting time and that she denied him dinner parenting time with A.S.

¶ 8 Shwetha filed responses to each of Rohit's petitions denying the allegations. A hearing was held on Rohit's petitions and other pending motions, including two motions to make minor adjustments to the 2014 custody agreement, in March 2024.

¶ 9 At the hearing, Shwetha testified that Rohit had not had an overnight visit with A.S. since Labor Day 2022. Rohit's dinners with A.S. had not occurred since September 2023. Shwetha did not offer make-up parenting time as A.S. did not want to go. Shwetha acknowledged that the guardian *ad litem* (GAL) report from 2021 did not recommend suspending Rohit's parenting time. From the end of March 2020 until May 2020, Rohit did not have any parenting time. On March 30, 2020, Shwetha messaged Rohit that A.S. should stay with her until the COVID-19 pandemic passed. Rohit did not have parenting during the summer of 2020.

¶ 10 At various times from 2020 to 2022, Shwetha messaged Rohit asking him to change his days for parenting time. Shwetha testified she would suggest dates where Rohit would "have a higher chance of having parenting time." She was "trying to make it easier here, not denying him parenting time."

¶ 11 A.S. began seeing Dr. Alan Childs in spring 2020. Shwetha asked the court for counseling for A.S. because he was refusing to see Rohit. Shwetha testified that A.S. would cry and lock himself in the bathroom. She would try to get A.S. to go with his father and A.S. would cry and say he did not want to go. Shwetha did not want to "push" A.S. out the door in this state. She consulted Dr. Childs, who recommended she not force A.S. to leave. A.S. would sporadically go with Rohit; however, he currently did not want to go at all. A.S. would have issues not sleeping well as he got anxious before visiting Rohit. A.S. would also cry and ask Shwetha to give him a break from visiting Rohit.

¶ 12 Therapy with Dr. Childs continued until late 2022. No positive progress was being made so a reunification therapist was recommended. The purpose of this therapy was to improve the

relationship between A.S. and Rohit. A.S. began having parenting time with Rohit. During the summer of 2021, issues began again. During the Fourth of July weekend, Shwetha received a phone call from A.S. while he was with Rohit. A.S. was crying and wanted to come home. Shwetha attempted to calm him down and encouraged A.S. to stay with Rohit. After that visit, A.S. did not have more extended parenting time Rohit during that summer. Once summer break was over, A.S. started doing alternate weekend and midweek parenting time with Rohit.

¶ 13      Shwetha also asked Dr. Mary Gardner if she should do anything more in terms of encouraging A.S. to spend time with his father, Rohit. On the recommendation of Dr. Gardner, A.S. began texting Rohit directly about his willingness or unwillingness to go for parenting time. Shwetha told A.S. that he needed to communicate with his father. A.S. wants a relationship with Rohit but he does not feel like he is being heard in his presence. Shwetha testified that she wanted A.S. to have "a healthy happy relationship" with Rohit.

¶ 14      For Father's Day in 2023, A.S. and Rohit made an agreement during counseling that they would have brunch for a few hours. Rohit changed the plans and wanted A.S. for the whole day. A.S. refused to go. Shwetha testified that she tried to get A.S. to go with Rohit but A.S. was distressed.

¶ 15      Shwetha testified that she was concerned that A.S. was under a lot of stress when he was alone with Rohit. The situation also had taken a toll on her as she had to watch A.S. deal with all of his emotion and distress. Shwetha wanted the situation to change and for A.S. to have a nice relationship with his father. A.S. had a lot of guilt because he thought his actions made his father sad. It has affected A.S.'s mental health and emotional stability.

¶ 16      Shwetha testified that she had not been able to make joint decisions with Rohit regarding A.S.'s health, education, extracurricular activities, and religion "in a productive way." Therefore, Shwetha wanted sole decision-making.

¶ 17      Dennis Sopata testified he was appointed on December 14, 2020, as the GAL. There had been a prior GAL, David Pasulka. Sopata was concerned with the amount of progress being made given the length of time A.S. had been involved in therapeutic intervention and how long the case had

been going on. A.S. was getting to the age where he could form his own judgments and get his own ideas. Sopota suggested to Rohit that he should have a fresh start with A.S. and get to a point where he could understand A.S.'s interests. Sopata thought both parents would benefit from therapy. Sopata opined that Shwetha had to understand she could not deny parenting time and that A.S. needed therapy to understand his father. Furthermore, Rohit needed to understand his child's needs. Sopata was aware of the Father's Day incident. A.S. did not want to visit Rohit since he did not feel that his father was being truthful and following through with their agreement.

¶ 18 Sopata testified that A.S. was a sensitive, thoughtful 12-year-old. Despite the current circumstances, A.S. did well in school. He had a lot of friends at school, and he was engaged in extracurricular activities. Notwithstanding, reunification therapy between A.S. and Rohit had "hit a dead end." Rohit, whether intentional or not, contributed to this situation. Rohit would say uncomplimentary things about Shwetha, causing A.S. anxiety and feeling uncomfortable. Since his initial recommendation three years prior, the situation had gotten worse. A.S. was emotionally fragile and afraid of what would happen on a visit with his father. Rohit needed to relieve A.S.'s fear and trepidation by recognizing that it exists and doing his best to move on with A.S. Sopata did not think that Rohit believed that A.S. was being truthful and Rohit did not believe that A.S. had problems with parenting time. Rohit prefers to believe that Shwetha is interfering with his relationship with his son and causing the problems. Sopata viewed text messages where A.S. would express that he did not want to have parenting time with Rohit. A.S. confirmed to Sopata that he sent those messages.

¶ 19 Sopata did not believe that Rohit should have most of the parenting time, and he thought Rohit's request that A.S. live with him was understandable but also reflected "such poor judgment in light of what's happening here." Regarding decision-making, based on the parties' testimony and Dr. Gardner's report, he did not know how Rohit and Shwetha would be able to practically make joint decisions regarding health and education. Sopata opined that Shwetha should have sole decision-making authority for educational and medical issues. Regarding extracurricular activities, Shwetha should have final decision-making authority if there was a disagreement. For parenting

time, Sopata testified that the parties needed to attend meaningful therapy. A.S.'s wishes should be taken into consideration. He is mature, independent, intelligent, and sensitive.

¶ 20　　Dr. Gardner, a licensed clinical psychologist, was appointed to complete a section 604.10(b) evaluation in 2022. Additionally, she was appointed to do an update in 2023. Dr. Gardner met with A.S. on four occasions. Dr. Gardner met with the parties for approximately 16 to 17 hours. In addition, Dr. Gardner reviewed medical records, school records, emails and communications from Our Family Wizard, court documents, and the GAL's report.

¶ 21　　Shwetha told Dr. Gardner that A.S. was very distressed about spending time alone with Rohit. A.S. would become nervous and anxious, and he did not want to go if he had to be alone with his father. Shwetha also told Dr. Gardner that Rohit would speak negatively about her to A.S. and that caused him distress. A.S.'s mental state was deteriorating. Shwetha was attempting to put her best foot forward.

¶ 22　　Rohit told Dr. Gardner that there were no issues between him and A.S. and that they had a very close relationship. Dr. Gardner did not believe this statement based on her interviews with A.S. A.S. stated that Rohit made him feel bad about himself, Rohit was not very nice to him, that he did not want to spend time with Rohit, and that he was beginning to feel depressed and having some thoughts about hurting himself.

¶ 23　　Rohit described Shwetha as a pathological liar. She was deceptive and manipulative. Dr. Gardner asked Rohit for documentation that Shwetha was alienating him from A.S. Based on the document he gave her, Dr. Gardner did not see any of the typical things she would expect to see in a child alienation case. In fact, Dr. Gardner concluded the reverse, that Shwetha was doing whatever she could to promote the relationship, but she was concerned about A.S. Rohit also told Dr. Gardner that Shwetha was turning A.S. against him and she was interfering with his parenting time. Dr. Gardner did not believe the evidence that Rohit provided for his allegations.

¶ 24　　A.S. informed Dr. Gardner that he was reluctant to see Rohit due to Rohit's unkind behavior towards him. He expressed concerns about being compelled to comply with Rohit's demands and

engaging in activities against his will. A.S. reported feeling "quite nervous and fearful around his father" and expressed a strong preference not to be alone with him.

¶ 25     Dr. Gardner conducted observations of A.S. with Shwetha and Rohit. During interactions with Shwetha, A.S. demonstrated a positive relationship characterized by ease and enjoyment in their activities. Dr. Gardner did not note any irregularities in their behavior. In contrast, interactions between A.S. and Rohit were notably different. The level of conversation was minimal, and the atmosphere became tense during gameplay. A.S. was relatively quiet, offering only occasional comments regarding the game. Dr. Gardner observed a lack of enjoyment in these interactions.

¶ 26     A.S. had been in counseling with Dr. Childs for over two years. The counseling had been helpful to A.S., assisting him with his anxiety and some of the distress he was experiencing. A.S. was doing very well in school. He was in advanced academic classes.

¶ 27     In her initial report, Dr. Gardner recommended there should be dinner visits between A.S. and Rohit but rejected any overnight visits until their relationship is repaired. Dr. Gardner also opined that Shwetha should have sole decision-making authority. During her updated report, Dr. Gardner followed the same method she had for her initial report. She did not see any significant change. In her updated report, Dr. Gardner recommended that there should be direct communication during therapy between A.S. and Rohit about substantive issues. Dr. Gardner also recommended that they have daily text communication.

¶ 28     Wendy Pawelski, a licensed professional counselor, testified she had 15 sessions with A.S. and Rohit. Pawelski's impression was that "the child was uncomfortable in the meetings" and they were working on making A.S. feel comfortable in expressing his concerns and feelings. A.S. and Rohit were not connecting and the conversations were "empty." A.S. had become more assertive. He was able to communicate his feelings and tell Rohit why he was upset. Rohit would say he understood but his actions did not demonstrate that he appreciated A.S.'s point of view. The goals for reunification therapy between A.S. and Rohit were to keep it light and build on basic activities. During the sessions, A.S. had been cooperative. Rohit was also cooperative; however, Rohit had

not taken accountability and struggled to understand his own role in fomenting the issues he complained of.

¶ 29     Pawelski had two or three conversations with Dr. Gardner. Pawelski told Dr. Gardner that the sessions were going slowly and she was working on establishing boundaries. A.S. would get visibly upset and would disassociate. During one session, A.S. started tearing up and left. Pawelski told Dr. Gardner that Rohit did not believe there were any issues or estrangement between him and A.S.

¶ 30     Pawelski spoke with the GAL five or six times, providing periodic updates on the progress of reunification therapy. She expressed concerns that the sessions were making A.S. uncomfortable and causing him stress. A.S. would cry, tear up, and ask to leave to compose himself. Due to these reactions, Pawelski felt the sessions should be stopped because the same issues were recurring and no progress was being made. Additionally, Pawelski informed the GAL that she had not observed any behavior from Shwetha indicating interference with the reunification therapy.

¶ 31     Pawelski testified she was aware of the June 2023 Father's Day incident. At a previous session, a Father's Day brunch was planned with a start and end time. Rohit wanted more time and changed the plan, which made A.S. "extremely anxious." A.S. did not want to meet with Rohit on Father's Day. He told Rohit, but Rohit came home and waited outside.

¶ 32     Pawelski spoke with Rohit's therapist twice. Based on those conversations, her understanding was that Rohit believed his relationship with A.S. was fine and Shwetha was sabotaging it. Pawelski believed that continued reunification therapy would be helpful and that they would need to continue working on communication skills, but she also said it would be difficult to continue if they do not make progress. Pawelski also recommended that Rohit have extensive therapy to understand how his actions affect A.S. and how comments can be hurtful and cause issues.

¶ 33     Pawelski testified that A.S. had been estranged from Rohit. A.S. did not feel comfortable visiting Rohit and he does not feel comfortable talking to Rohit. Pawelski met with A.S. individually and discussed how he was feeling. A.S. had issues with Rohit commenting on his

weight and pressuring him to be active and to exercise. He also had issues with Rohit blaming other people for what he did and not saying sorry.

¶ 34　　Rohit testified the last time A.S. spent the night at his home was Labor Day weekend in 2022. During the weekend, Rohit and A.S. went to a theme park, did outside activities, played basketball, and hiked. A.S. did not seem distressed and did not ask to go home early. The last time Rohit had dinner with A.S. was September 26, 2023. The dinners usually lasted an hour and a half. The last time A.S. spent Christmas with Rohit was in 2020.

¶ 35　　Rohit also testified the last time he had extended parenting time was during the summer of 2022. He stated there were times he was denied extended parenting time. During Christmas in 2019, Rohit planned a trip with A.S., but Shwetha filed an emergency motion. In 2020, Rohit did not have any extended parenting time during the summer. In 2021, Rohit planned three weeks of extended parenting time. He was able to spend two weeks with A.S., but the third week was denied. During the summer of 2022, Rohit was able to spend one week with A.S. Rohit testified he did not have any extended parenting time in 2023. The last time he was able to take A.S. to India was in 2018. Rohit testified he also had issues with contacting A.S. on the phone. Rohit testified that Shwetha did not offer makeup parenting time.

¶ 36　　During the COVID-19 pandemic, Rohit lost parenting time from March 2020 through May 2020. Rohit testified he suggested an alternative parenting time schedule, but Shwetha did not agree to it. During this time, Rohit had "random sporadic phone calls" with A.S.

¶ 37　　Rohit agreed to attend therapy sessions with A.S. and Dr. Childs in May of 2020. Rohit testified he went to the sessions to see A.S. consistently and he "was willing to do anything *** to make it possible to get back and see him." Dr. Childs did not recommend a change in the parenting time schedule.

¶ 38　　Rohit asked the court to modify decision making. Rohit wanted sole decision-making in matters relating to religion, education, extracurricular activities, and medicine. Rohit testified that he did not know when some of A.S.'s extracurriculars occurred because Shwetha did not discuss it with him before signing A.S. up. Rohit suggested activities like summer camp, robotics, and

basketball, but Shwetha did not agree. Rohit believed that Shwetha had control over these decisions.

¶ 39 Rohit testified he had concerns about A.S.'s weight and he had proposed "solutions." Rohit also had concerns about A.S.'s screen time. Rohit further testified he was concerned about A.S.'s B.M.I., his blood work results, and his vision. Rohit was concerned about "[t]he limited amount of *** physical activities and the diet his mother was providing." As part of his religion, Rohit does not eat meat. He only provided A.S. with vegetarian meals. Shwetha introduced meat into A.S.'s diet without discussing it with Rohit. Rohit also asked the court for majority parenting time to avoid the situations they had had to deal with for the last few years.

¶ 40 Rohit testified that he had "an excellent or very good relationship" with A.S. Rohit stated that Shwetha was responsible for the estrangement between him and A.S. According to Rohit, the reason for reunification therapy was "the mother's alienation." Shwetha had been denying his parenting time since the pandemic.

¶ 41 On July 11, 2024, the court found that Shwetha to be in indirect civil contempt, based on the allegations supporting Rohit's three petitions for rules to show cause, for willfully not complying with the 2014 custody agreement. It also found that her "conduct demonstrated a blatant disregard to encouraging and promoting a health[y] relationship with Rohit and the minor child." The court ordered Shwetha to complete 10 hours of coparenting therapy with a therapist recommended by the GAL. However, in view of the deterioration of Rohit and A.S.'s relationship, the court declined to restore the custody arrangement that had been agreed to in 2014. Instead, as set forth in the modified allocation judgment, while the parties continued to engage in court-ordered "high conflict therapeutic counseling," Rohit's parenting time would be limited to two dinners in a public place every week, with an eventual goal to return to the parenting time allocation contemplated by the 2014 custody agreement. Although noting that neither party had filed a motion to modify the allocation of decision-making responsibility, the court found that a substantial change in circumstances had occurred and that, "[g]iven the current relationship between Rohit and the minor child together with very limited parenting time," Shwetha would have sole decision-making

authority as to A.S.'s extracurricular activities until such time as "regular parenting time is resumed." The court further found that it was still A.S.'s best interests for medical and educational decisions to remain his parents' joint responsibility.

¶ 42    On August 5, 2024, Shwetha filed a motion to reconsider the court's July 11 order, which raised various oversights and inconsistencies not relevant to this appeal. Her motion did not challenge the court's decision to allocate joint responsibility for medical and educational decisions. One of the inconsistencies raised in the motion had to do with the provider of coparenting therapy. While addressing that inconsistency at an April 30, 2025 hearing on the motion, the court elaborated on its contempt determination, explaining that it had ordered Shwetha to go to individual counseling "as part of what the purge would be for her to try to resolve" the contempt finding. The court granted the motion, resolving the inconsistencies raised by Shwetha. This appeal follows.

¶ 43                              II. ANALYSIS

¶ 44    On appeal, Shwetha argues: (1) the findings of contempt were contrary to law as she was not afforded proper due process and there was no purge provision, (2) that the findings of contempt were an abuse of discretion and against the manifest weight of the evidence, and (3) that the court erred when it continued joint decision-making.

¶ 45                          A. Contempt of Court

¶ 46    "Contempt of court has been defined as 'conduct that is calculated to impede, embarrass, or obstruct the court in its administration of justice or derogate from the court's authority or dignity, or to bring the administration of the law into disrepute.' " *Windy City Limousine Co. v. Milazzo*, 2018 IL App (1st) 162827, ¶ 36 (quoting *People v. Geiger*, 2012 IL 113181, ¶ 26). "Courts have the inherent authority to reprimand contemptuous conduct because 'such power is essential to the maintenance of their authority and the administration of judicial powers.' " *Id*. (quoting *People v. Simac*, 161 Ill. 2d 297, 305 (1994)).

¶ 47    Contempt may be direct or indirect and either civil or criminal. *Id*. "Generally, civil contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party." *In re Marriage of Charous*, 368 Ill. App. 99, 107 (2006). Indirect civil contempt "covers the entire range of contemptuous conduct which does not occur in open court or in a constituent part of the court." *In re Marriage of Betts*, 200 Ill. App. 3d 26, 48 (1990). In order to find a person in indirect civil contempt, there must be "[t]he existence of [a valid] order of the trial court and proof of a willful disobedience of that order." *Charous*, 368 Ill. App. 3d at 107. A finding of indirect civil contempt will not be disturbed unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *In re Marriage of Barile*, 385 Ill. App. 3d 752, 759 (2008).

¶ 48    Indirect civil contempt requires minimal due process, which consists of notice and the opportunity to be heard. *Betts*, 200 Ill. App. 3d at 52-3. Notice of an indirect civil contempt proceeding must (i) "contain an adequate description of the facts on which the contempt charge is based" and (ii) "inform the alleged contemnor of the time and place of an evidentiary hearing on the charge within a reasonable time in advance of the hearing." *City of Quincy v. Weinberg*, 363 Ill. App. 3d 654, 664 (2006). Importantly,

> "A petition for a rule to show cause is the method for notifying the court that a court order may have been violated, and the petitioner requests a hearing on the issue. The petition for a rule to show cause and the rule to show cause operate together to inform the alleged contemnor of the allegations against her. The rule to show cause is the method by which the court brings the parties before it for a hearing. It also notifies the alleged contemnor of the time and place of the hearing. Thus, the petition for a rule to show cause initiates the contempt proceedings, but it does not establish that a violation of a court order has in fact occurred. The rule to show cause, issued by the court, is not a finding a violation of a court order has occurred, but part of the process of notifying the

alleged contemnor of the charges, and time and place of the hearing. At the hearing, the burden is on the petitioner to show a violation of a court order has occurred. Once this showing has been made, the burden shifts to the alleged contemnor to show the violation was not wilful."

*In re Marriage of LaTour*, 241 Ill. App. 3d 500, 508 (1993). "When a court fails to issue a rule to show cause and serve it on the alleged contemnor prior to holding her in indirect civil contempt, the court deprives her of due process because she lacks proper notice of the contempt proceeding." *Milton v. Therra*, 2018 IL App (1st) 171392, ¶ 40.

¶ 49 Here, Shwetha contends that the contempt findings were contrary to law as no rules to show cause were issued. Rohit filed multiple petitions for rules to show cause; however, the circuit court never issued a rule to show cause for any of Rohit's petitions. While the circuit court did not issue rules to show cause, the record indicates Shwetha had notice of the hearing and the opportunity to present evidence. Shwetha filed responses to Rohit's petitions. Additionally, Shwetha filed a motion to bar evidence at trial and stipulated to evidence that would be admitted at trial. Shwetha testified at the hearing and called witnesses. Therefore, we find that Shwetha was provided with adequate due process and was given a "full opportunity to explain any noncompliance" with the court's order through the presentation of witnesses and evidence. See *Milton*, 2018 IL App (1st) 171392, ¶ 44; see also *Betts*, 200 Ill. App. 3d at 52-3.

¶ 50 Illinois courts have held that a parent must comply with a court-ordered visitation schedule even when the child does not desire to visit the other parent. See *Charous*, 368 Ill. App. 3d at 111-12, *In re Marriage of Marshall*, 278 Ill. App. 3d 1071, 1082-83 (1996), *In re Marriage of Reed*, 100 Ill. App. 3d 873, 877 (1981). "[T]he custodial parent cannot escape his or her duty to comply with the visitation provisions by 'attempting to shift this burden to the discretion of [his or] her children.' " *Charous*, 368 Ill. App. 3d at 112 (quoting *Doggett v. Doggett*, 51 Ill. App. 3d 868, 872 (1977)). Here, the custody agreement detailed the days and time when Rohit was to have parenting time with A.S. The evidence introduced at the hearing through testimony and exhibits established that Shwetha failed to meet these obligations to facilitate A.S.'s visitation with Rohit. Further, there

was no evidence offered to establish that visitation with Rohit would compromise A.S.'s safety or well-being. See *Charous*, 368 Ill. App. 3d at 113 ("Although perhaps David's parenting skills might have been a reason for the children's unwillingness to participate in visitation, they did not provide Jodi a lawful justification to violate numerous provisions of the parenting agreement."). Therefore, we find the record presents evidence to support the circuit court's findings of contempt.

¶ 51                                B. Purge Provision

¶ 52        A person held in civil contempt must have the ability to purge the contempt by complying with the court order. *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 26. Civil contempt is coercive in nature and must afford the contemnor the "keys to his cell." *In re Marriage of Logston*, 103 Ill.2d. 266, 289 (1984). In its order granting Rohit's petition for rule to show case, the circuit court ordered Shwetha to "engage in and complete no less than 10 hours of co-parenting counseling, to facilitate a comprehension of what actions can be overcome to promote and encourage a healthy relationship between the minor child and Rohit." Shwetha argues that the circuit court's order is invalid as it does not allow her to purge the findings of contempt. We agree.

¶ 53        " 'The power to enforce an order to pay money through contempt is limited to cases of wilful refusal to obey the court's order.' " *In re Marriage of Barile*, 385 Ill. App. 3d 752, 758 (2008) (quoting *Logston*, 103 Ill. 2d at 285). Noncompliance with a court order constitutes *prima facie* evidence of contempt. *Logston*, 103 Ill. 2d at 285. Once it is proven that a court order has been violated, the burden shifts to the respondent to show they should not be held in contempt. *Id*. A finding of indirect civil contempt will not be disturbed unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *Barile*, 385 Ill. App. 3d at 759. Additionally, if the underlying order of the trial court is later found to be invalid, then the contempt order must be vacated. *In re Marriage of Radzik*, 2011 Ill App (2d) 100374, ¶ 66.

¶ 54        Here, the circuit court found Shwetha in contempt, but it did not provide her a way to purge her civil contempt. "A valid purge *** serves a curative purpose, not a prophylactic one." *Edwards v. Pekin Memorial Hospital*, 2023 IL App (3d) 210005, ¶ 42. Further, "the contemnor must have

an opportunity to purge himself of contempt by complying with the pertinent court order." *Betts*, 200 Ill. App. 3d at 44. "Contempt based on past actions which cannot be undone means that the contemnor lacks the ability to purge the contempt." *O'Malley*, 2016 IL App (1st) 151118, ¶ 26. The circuit court found Shwetha in contempt for violating the custody agreement and restricting and interfering with Rohit's parenting time. Rohit argues that, based on the circuit court's order, "Shwetha holds the keys to her own cell" as it required her to attend co-parenting counseling. However, the circuit court's order does not provide a specific or express purge provision that is identifiable. See *In re A.M.*, 2020 IL App (4th) 190645, ¶ 32. While the court later described the co-parenting therapy as the purge at the April 20, 2025 hearing, the order finding her in contempt does not identify that directive as the purge. Furthermore, the co-parenting therapy would not serve as a valid purge. The court's order required the GAL to recommend a therapist for Shwetha. Where a purge provision requires the participation of a third party, it is invalid. See *Bank of America, N.A. v. Freed*, 2012 IL App (1st) 113178, ¶ 44 (requiring a third party to make a recommendation takes the keys out of the hand of the contemnor). Accordingly, the civil contempt finding must be vacated.[2]

¶ 55                                   C. Joint Decision Making

¶ 56        Finally, Shwetha argues that the circuit court erred by not terminating joint decision-making and asks us to remand with instructions to order exclusive decision-making to her. Rohit responds that it would have violated his due-process rights to terminate joint decision-making when neither party had filed a motion to do so. See generally 750 ILCS 5/610.5 (West 2024).

¶ 57        Both parties seem to overlook that the court did, in fact, modify the decision-making allocation. After observing that neither party had filed a motion asking to modify decision-making, the court nevertheless found that there had been a substantial change in circumstances and that a

---

[2]    Our holding does not affect the order for Shwetha to engage in counseling, which the court is empowered to order upon finding that a parent has not complied with allocated parenting time. See 750 ILCS 5/607.5(c)(3), 607.6(a)(3) (West 2024); see also *In re A.M.*, 2020 IL App (4th) 190645, ¶¶ 25-26, 33 (vacating contempt finding but not relief ordered under section 607.5, including counseling).

modification was necessary to serve A.S's best interests, a finding that required a modification to the allocation judgment. *See id.* § 610.5(c). It then found as follows:

> "The Court finds given the minor child's age together with a history of established medical providers and academic pursuits, it is still in the minor child's best interest for decisions relating to medical and education to remain joint decisions. Given the current relationship between Rohit and the minor child together with very limited parenting time, Shwetha shall be awarded temporary sole decision making relating to the minor child's extra-curricular activities provided that enrollment in said activities do[es] not interfere with Rohit's limited parenting time and therapeutic sessions. Once regular parenting time is resumed and expanded to include alternating weekends, the parties will once again resume joint decision making on the issue of extra-curricular activities."

The record unambiguously shows that the court did, contrary to Shwetha's argument, order a modification.

¶ 58     On the merits, Shwetha argues that the court erred by not awarding her sole decision-making authority where the parties and other witnesses testified that she and Rohit could not effectively cooperate when it came to issues involving A.S. We note that Shwetha does not argue that the circuit court's determination that it would be in A.S.'s best interests to continue joint decision-making as to significant medical and educational decisions was against the manifest weight of the evidence. See 750 ILCS 5/602.5(a) (West 2024) (requiring court to allocation decision-making responsibility according to the child's best interests) *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47 (standing standard of review). She raises only a narrow legal argument that joint decision-making is improper when the parents cannot effectively cooperate. She has therefore forfeited any broader challenge she may have made to the court's allocation determination. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 59　　　As to the argument she does make, we are not persuaded. Shwetha's contention that the court erred by not awarding her sole decision-making authority rests entirely on testimony offered by the parties and other witnesses that they did not believe they could effectively cooperate as to A.S. That fact would likely have been determinative under the old "child custody" paradigm, which treated "joint custody" as a binary condition that either existed or did not exist. See 750 ILCS 5/602.1 (West 2014). Under that regime, the ability of the parents to cooperate effectively as to joint parenting was a necessary condition for a joint custody arrangement. See *id.* § 602.1(c)(1) (articulating ability to cooperate as one of two enumerated factors to consider); see also *In re Marriage of Iqbal*, 2014 IL App (2d) 131306, ¶ 56 (treating effective cooperation as a requirement for joint custody); *accord In re Marriage of Melton*, 288 Ill. App. 3d 1084, 1087 (1997); *In re Marriage of Swanson*, 275 Ill. App. 3d 519, 522 (1995). But in 2016, Illinois abandoned the all-or-nothing custody regime in favor of a more nuanced approach under which discrete parental responsibilities, including making significant decisions in specific domains, are allocated to the parents. See 750 ILCS 5/602.5, 602.7, 602.8 (West 2024). Under this approach, the ability of the parents to cooperate in shared decision-making is just one of more than a dozen factors the court takes into account when determining what allocation is in the child's best interest. See *id.* § 602.5(c). Although the evidence that Rohit and Shwetha cannot effectively cooperate as to A.S. at this time is certainly relevant, that fact is no longer itself determinative. We therefore reject Shwetha's argument that this evidence necessarily precludes any joint decision-making allocation and affirm the circuit court's modification of allocation judgment.

¶ 60　　　　　　　　　　　III.  CONCLUSION

¶ 61　　　For the foregoing reasons, we vacate the circuit court's order insofar as it found Shwetha in indirect civil contempt. We otherwise affirm.

¶ 62　　　Affirmed in part and vacated in part.